IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  05-cv-02467-EWN-BNB

MOHAMMED SALEH,

Plaintiff,

FEDERAL BUREAU OF PRISONS;
HARLEY LAPPIN, Director;
JOHN VANYUR, Assistant Director/Programs;
KATHLEEN KENNEY, Assistant Director/Operations;
G. HERSHBERGER, Regional Director;
MICHAEL NALLEY, Regional Director;
RON WILEY, Warden;
JOHN SHARTLE, Associate Warden;
MARK MUNSON, Associate Warden;
MAUREEN CRUZ, Associate Warden;
HARVEY CHURCH, Captain;
D.J. KRIST, Special Investigative Agent;
"FNU" JAVERNICK, Case Management Coordinator;
GEORGE KNOX, Correctional Counselor;
MARK COLLINS, Unit Manager;
T. GOMEZ, Unit Manager;
TINA SUDLOW, Case Manager;
"FNU" REILLEY, Chaplain;
KEITH POWLEY, Chaplain;
D. LAW, Chaplain's Assistant;
"FNU" JONES, Food Service Administrator; and
DAVID JOHNSON, Agent/Employee, Federal Bureau of Investigation,

in their official capacities,

Defendants.

---

**THIRD AMENDED COMPLAINT
FOR INJUNCTIVE AND DECLARATORY RELIEF**

---

### Nature of the Case

1. Plaintiff, Mohammed Saleh, who is incarcerated at the Administrative Maximum Security Prison ("ADX"), in Florence, Colorado, by and through his attorneys, the University of Denver Sturm College of Law Student Law Office, hereby submits his Third Amended Complaint for violations of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, and the Religious Freedom Restoration Act.

### Jurisdiction and Venue

2. This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 2201, and 2202.

3. Venue is proper within this district pursuant to 28 U.S.C. § 1391 as all events giving rise to the claims occurred in this judicial district.

### Parties

4. Plaintiff Mohammed Saleh is a federal prisoner in the custody of the United States Bureau of Prisons, who has been continuously confined in ADX since February 2003.

5. Defendant Federal Bureau of Prisons ("BOP") is an agency of the United States charged with the management of all Federal penal and correctional institutions, including the United States Penitentiary-Administrative Maximum in Florence, Colorado.

6. Defendant Harley Lappin is the Director of the BOP, with authority over and responsibility for the management and direction of the BOP, including the designation and transfer of federal prisoners.

7. Defendant John Vanyur is Assistant Director of BOP Correctional Programs Division, with authority over and responsibility for correctional programs in the BOP, including the designations and transfers of federal prisoners to and from ADX and ADX correctional programs.

8. Defendant Kathleen Kenney is Assistant Director of BOP Correctional Operations Division, with authority over and responsibility for correctional operations in the BOP, including the designations and transfers of federal prisoners to and from ADX and ADX correctional operations.

9. Defendant G. Hershberger was, at the times relevant as stated herein, Regional Director for the BOP North Central Regional Office, with authority over and responsibility for the management and direction of all BOP facilities and institutions located within its North Central Region, in which the ADX is situated, including the designation and transfer of federal prisoners.

10. Defendant Michael Nalley is Regional Director for the BOP North Central Regional Office, with authority over and responsibility for the management and direction of all BOP facilities and institutions located within its North Central Region, in which the ADX is situated, including the designation and transfer of federal prisoners.

11. Defendant Ron Wiley is the Warden of ADX, with authority and responsibility for management and direction of ADX, including decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and religious accommodation; and the

designation of exercise facilities and the amount and type of exercise opportunities that prisoners receive.

12.  Defendant John Shartle was, at the times relevant as stated herein, the Associate Warden of Programs at ADX, with authority over and responsibility for correctional programs at ADX, including decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faith and religious accommodation; and the designation of exercise facilities and amount and type of exercise opportunities prisoners receive.

13.  Defendant Mark Munson is an Associate Warden of ADX with authority over and responsibility for correctional programs at ADX, including decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faith and religious accommodation; and the designation of exercise facilities and amount and type of exercise opportunities prisoners receive.

14.  Defendant Maureen Cruz is Associate Warden of Operations of the BOP Federal Correctional Complex in Florence, Colorado, which includes ADX, with authority over and responsibility for correctional programs at ADX, including decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faith and religious accommodation; and the designation of exercise facilities and amount and type of exercise opportunities prisoners receive.

15. Defendant Mark Collins is a Unit Manager at ADX, with authority over and responsibility for the management and direction of prisoner housing units at ADX, including decisions regarding:  the designations and transfers of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and religious accommodations; and the designation of exercise facilities and the amount and type of exercise opportunities that ADX prisoners receive.

16. Defendant T. Gomez is a Unit Manager at ADX with authority over and responsibility for the management and direction of prisoner housing units at ADX, including decisions regarding:  the designations and transfers of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and religious accommodations; and the designation of exercise facilities and the amount and type of exercise opportunities that ADX prisoners receive.

17. Defendant "FNU" Reilley is the Chaplain at ADX, responsible for managing the Religious Services Department at ADX, including all matters relating to the accommodation of prisoners' religious needs and activities.

18. Defendant Keith Powley was, at all relevant times stated herein, the Chaplain at ADX.

19. Defendant D. Law is the Chaplain's Assistant at ADX, responsible for assisting the Chaplain in performance of official duties and with the administration and management of the Religious Services Department, including accommodation of the religious needs and activities of prisoners.

20. Defendant Harvey Church is a Captain at ADX, responsible for correctional operations and security, including participating in decisions regarding:  the designation and transfer

of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and approval of religious accommodations; and the designation of exercise facilities and the amount and type of exercise opportunities that ADX prisoners receive.

21. Defendant D.J. Krist is a Special Investigative Agent of ADX, with authority over and responsibility for the management and direction of the Special Investigative Services at ADX, including participating in decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and approval of religious accommodations; and the designation of exercise facilities and the amount and type of exercise opportunities that ADX prisoners receive.

22. Defendant "FNU" Javernick is the Case Management Coordinator at ADX, responsible for case management coordination at ADX, including participating in decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and approval of religious accommodations; and the designation of exercise facilities and the amount and type of exercise opportunities that ADX prisoners receive.

23. Defendant George Knox is a Correctional Counselor assigned to D-Unit of ADX, responsible for correctional counseling at ADX, including participating in decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and approval

of religious accommodations; and the designation of exercise facilities and the amount and type of exercise opportunities that ADX prisoners receive.

24. Defendant Tina Sudlow is a Case Manager assigned to D-Unit of ADX, responsible for prisoner case management at ADX, including participation in decisions regarding:  the designation and transfer of prisoners to and from ADX; the extent and manner that ADX prisoners are permitted to exercise their religious faiths and approval of religious accommodations; and the designation of exercise facilities and the amount and type of exercise opportunities that ADX prisoners receive.

25. Defendant "FNU" Jones is the Food Serve Administrator at ADX, responsible for administration and management of the ADX Food Services Department, including the procurement and provision of nutritionally adequate and religiously appropriate foods that meet the dietary needs of prisoners.

26. Defendant David Johnson is an employee of the Federal Bureau of Investigation, an agency of the United States, who is assigned to ADX and is responsible for advising and coordinating and cooperating with ADX Special Investigative Services staff, including participating in decisions regarding:  the designation and transfer of prisoners to and from ADX; and the extent and manner that ADX prisoners are permitted to exercise their religious faiths and religious accommodation, including which religious texts and videos are available to prisoners.

## General Facts

27. Plaintiff Saleh is incarcerated in the U.S. Penitentiary - Administrative Maximum (ADX) in Florence, Colorado.  ADX is the only "supermax" prison in the BOP, and is the most

secure prison in the federal system. Supermax facilities, such as ADX, are supermaximum-security prisons with highly restrictive conditions, designed to segregate the most dangerous prisoners from the general population. Some supermax facilities, such as ADX, operate or internalize a behavior modification program.

28. According to BOP Program Statement P5100.08, ADX is designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution. Additionally, ADX is only supposed to be used for those inmates with severe or chronic behavior problems that cannot be addressed in any other Bureau institution.

29. The main mission of the ADX is to affect inmate behavior such that inmates who demonstrate non-dangerous behavior and participate in required programs progress to another, more open BOP facility.

30. The ADX is comprised of nine separate housing units, each of which is further subdivided into "sides" or ranges. The nine units are designated as Beta ("B-Unit"), Delta ("D-Unit"), Echo ("E-Unit"), Foxtrot ("F-Unit"), Golf ("G-Unit), Hotel ("H-Unit"), Joker ("J-Unit"), Kilo ("K-Unit), and Zulu ("Z-Unit"). Each unit houses approximately 64 prisoners in individual, single-occupancy cells.

31. B-Unit is the Bureau's "Control Unit." Federal regulations exist governing the Control Unit and provide for notice, hearing, and other procedures to prisoners before they may be placed in B-Unit. Those procedures are codified and published at 28 C.F.R. § 541.40 *et seq*. Those procedures do not apply and have not been extended to placement decisions in any other unit at ADX.

32. Until February of 2006, the D-Unit was considered a High Security Unit.  The conditions on the D-Unit were similar to those of the Control Unit.

33. D-, E-, F-, and G-Units have been designated and referred to by ADX local policy as "General Population Units."  Despite the nomenclature, however, these are not actual general population units.  Instead, the prisoners housed in these units are in solitary confinement no less and remain locked in their individual cells, alone, more than 23 hours per day on average and are not permitted any physical interaction with other inmates.  There is no general population prison at ADX, and it is not an open-population institution.

34. J-Unit has been designated as the "Intermediate Unit," one of two "Step-Down Units" at ADX, which houses prisoners in the first phase of the ADX "Step-Down Unit Program."

35. K-Unit has been designated as the "Transitional Unit," the second "Step-Down Unit" at ADX, which houses prisoners in the second phase of the ADX "Step-Down Unit Program."

36. A stratified system of housing inmates is used to provide inmates with incentives to adhere to the standards of conduct associated with a maximum security custody program.  As inmates at the ADX demonstrate periods of clear conduct and positive institution adjustment, they may progress from the "General Population" units to the Intermediate and Transitional Units.  Those successful in the Transitional Unit will move out to the United States Penitentiary, High Security, Florence, Colorado, where the Pre-Transfer phase of the Step-Down Program is housed.  It will take a prisoner a minimum of 36 months to work his way through the layered system of housing.  The minimum stay in the

"General Population" units is 12 months, the Intermediate Program 12 months, and Transitional Program 12 months, and the Pre-Transfer Unit 12 months.

37. An inmate at ADX who is in any phase of the Step-Down Unit Program may be terminated from that program and returned to a "General Population" unit if he receives even a single disciplinary violation.

38. With the exception of prisoners transferred to and placed in the B-Unit of ADX, prisoners transferred to and placed in ADX are not afforded any form of notice, hearing or fair opportunity for rebuttal in connection with the decision to place a prisoner in ADX, resulting in arbitrary, haphazard, discriminatory and erroneous placement decisions.

39. From July 2005 to April 2007, Plaintiff was incarcerated on the D-Unit at ADX.  On April 10, 2007, Plaintiff was approved for placement in the Step-Down Unit program, and was moved to J-Unit on April 17, 2007.

40. While on the D-Unit of ADX, the conditions of Plaintiff's confinement were more restrictive than any other form of incarceration in the BOP.  At ADX, almost every aspect of plaintiff's life is controlled and monitored.  Plaintiff ordinarily was required to remain in his cell 24 hours per day, except on those rare occasions that he was permitted out-of-cell exercise.  His solitary, box-car cell only provided approximately 12' x 6.5' of floor space.  Plaintiff was not permitted to experience direct sunlight and the artificial light in his cell provided only florescent lighting.

41. In the J-Unit, Mr. Saleh is confined to his cell for at least 22.5 hours per day.   His solitary, box-car cell only provides approximately 12' x 5.25' of floor space.  Plaintiff is

not permitted to experience direct sunlight and the artificial light in his cell provides only florescent lighting.

42. On the J-Unit, Plaintiff must take his meals alone in his cell instead of the cafeteria. Defendants limit Plaintiff's contact with the outside world to three 15-minute telephone calls per month with an immediate family member and five brief non-contact social visits a month, which are restricted to immediate family members and must be conducted through a glass wall.  All programs and privileges ordinarily available throughout the BOP are either nonexistent or severely restricted and limited at ADX.

43. Confinement at ADX is synonymous with extreme isolation. The cells in ADX have solid metal doors with metal strips and/or bristles along the bottoms which help to prevent conversation and unauthorized communication with other inmates.  Plaintiff is deprived of almost any meaningful environmental or sensory stimuli and of virtually all human contact, except for when he is permitted exercise, which he is allowed to do in a group of seven other prisoners or less.

44. Defendants also prevent Plaintiff from engaging in practices essential to fulfilling his religious beliefs.

*Facts for Claim 1: Deprivation of Mr. Saleh's Fifth Amendment Right to Due Process for Transfer to and Placement in ADX.*

45. The conditions at ADX are more restrictive than any other form of incarceration within the Bureau of Prisons system.  By placing Plaintiff in ADX, Defendants severely deprive Mr. Saleh of a liberty interest, as the conditions at ADX are much harsher than the conditions in the facilities that previously incarcerated him.

46. Mr. Saleh was originally incarcerated in the United States Penitentiary in Leavenworth, Kansas, from March 1996 to August 2001.  At USP-Leavenworth, he was held in a general population unit where he was able to have both indoor and outdoor group exercise, time out of his cell to interact with other prisoners, and employment.

47. In 2001, Mr. Saleh was moved to the United States Penitentiary in Florence, Colorado. There, he was confined in a general population unit where he was allowed indoor and outdoor group exercise and group meals.  Mr. Saleh was given unrestricted library use, including access to religious books.  He could participate in congregate religious services. He had constant human contact, direct access to sunlight and natural light, 300 minutes of telephone time a month, greater mail access than what ADX affords him, employment opportunities and the opportunity for several social visits a month.

48. On the morning of September 11, 2001, BOP officials arbitrarily placed Mr. Saleh in the Special Housing Unit ("SHU") at USP-Florence, despite the fact that he had no knowledge of or involvement in the events that took place that day.  He was held in the SHU until 2003, when the BOP transferred him to even harsher conditions at ADX.

49. The ADX program is a mandatory behavior modification program.  Prisoners placed in ADX suffer the permanently severe and traumatic stigmatizing consequence of being branded the "worst of the worst" and as suffering from "chronic behavioral problems." ADX placement therefore engenders severe adverse social consequences to Plaintiff far beyond that typically associated with incarceration.  The consequences of involuntary ADX placement and attendant restrictions visited upon Plaintiff are qualitatively different from the punishment characteristically suffered by one convicted of a federal offense, and

such confinement is well outside the ordinary range of conditions and degree of confinement to which a prison sentence typically subjects an individual.

50. ADX confinement, and Mr. Saleh's transfer to and placement in ADX, imposes an atypical and significant hardship in relation to the ordinary incidents of prison life, and has worked and continues to work a major disruption and change in his environment amounting to a grievous loss.

51. Mr. Saleh possessed and possesses a protected liberty interest in avoiding transfer to and placement in ADX and ADX supermax confinement. His interest in avoiding arbitrary, haphazard, discriminatory and erroneous placement in ADX is significant.

52. The BOP transferred Mr. Saleh, a Middle-Eastern Muslim, to ADX following the events of September 11, 2001, based on ethnic stereotypes, unfounded fears, and irrational speculation, and otherwise without justification, cause or excuse. Mr. Saleh's transfer to and placement in ADX was arbitrary, haphazard, discriminatory and erroneous. He does not meet any of the objective criteria for ADX placement and his presence in the open population prison did not otherwise pose any exceptional and valid high-security risks.

53. Prior to placement in ADX, Mr. Saleh was not given notice of the factual basis for his transfer and placement or an opportunity to rebut it. The lack of such procedural safeguards led to his arbitrary, haphazard, discriminatory and otherwise erroneous transfer to and placement in ADX.

54. If a policy exists that allows prisoners to grieve their placement in ADX, Mr. Saleh was not told of such a policy. A policy was not relayed to him orally, nor was a policy included in a packet of materials provided during the Admission and Orientation Program

that informs new prisoners of the rules, regulations, and policies of ADX.  Accordingly, Mr. Saleh was unable to challenge his placement in ADX.

55. Procedures used to assign inmates to ADX are lacking, inconsistent, and undefined, resulting in the arbitrary, haphazard, discriminatory and erroneous placement of prisoners, including Mr. Saleh.

56. Had Mr. Saleh been provided with adequate notice of any alleged factual basis leading to his consideration for ADX placement and a fair hearing or opportunity for rebuttal, such as the procedures already in place but extended only to the ADX Control Unit (B-Unit), placement decisions, codified at 28 C.F.R. § 541.40 *et seq*., he in all likelihood and probability would not have been arbitrarily, haphazardly, discriminately, and erroneously placed in ADX.  The conditions, treatment and restrictions of D-Unit are substantially similar to those of B-Unit.

57. Extending the current and existing notice and hearing procedures codified at 28 C.F.R. § 541.40 *et seq*., to Mr. Saleh and to all ADX placement decisions would have significant probative value in helping to eliminate and significantly reduce arbitrary, haphazard, discriminatory and erroneous ADX placement decisions, such as those visited upon Plaintiff.  Since those procedures have been and are already in place at ADX for B-Unit placement decisions, extending those existing procedures to the remainder of ADX placement decisions would have a de minimis, if any, negative impact on legitimate government interests.  Rather, procedures to avoid arbitrary and erroneous ADX placement decisions benefits legitimate governmental interests since the costs of ADX confinement per prisoner is more than triple that of open-population prison housing.

58. Defendants Lappin, Vanyur, Kenney, Hershberger/Nalley were aware of and involved in the decision to transfer and place Plaintiff in ADX.  These defendants possess authority to direct transfers of prisoners to and from ADX.  The BOP's Program Statement P5100.08 states that a prisoner should be considered for placement at another high security institution before being designated to ADX, and it is the job of the Regional Director of the North Central Region to decide if an inmate's placement in ADX is appropriate.

59. Mr. Saleh continues to be confined in ADX indefinitely.

*Facts for Claim 2:  Deprivation of Exercise in Violation of the Eighth Amendment*

60. In the J-Unit, where Mr. Saleh is currently housed, prisoners have not been permitted any outdoor exercise from September 2006 to May 1, 2007.  Since May 1, 2007, prisoners on the J-Unit have been permitted outdoor exercise two times per week, at most.

61. Due to the lack of outdoor exercise, Mr. Saleh has not been and is not permitted any access to direct sunlight or fresh air.

62. Outdoor exercise is a basic human need, and is extremely important to the psychological and physical well-being of Mr. Saleh.

63. In addition, Defendants Wiley, Cruz, Javernick, Shartle/Munson, Church and Gomez discourage Mr. Saleh from taking advantage of the limited opportunities he receives for out-of-cell exercise in a variety of ways.  Mr. Saleh is required to undergo an invasive and embarrassing strip search as a precondition to any out-of-cell exercise.  During out-of-cell exercise, Mr. Saleh is routinely harassed with shakedowns of his cell that often result in the temporary confiscation of some of the few personal items he is permitted,

and leaves his cell and legal papers in disarray.  Only prisoners who opt to forego their

exercise periods are rewarded with exemptions from these strip searches and

shakedowns.

64. Defendants Wiley, Cruz, Javernick, Shartle/Munson, Church and Gomez are aware of the

J-Unit out-of-cell exercise regime described above, including the insufficient

opportunities for adequate and meaningful exercise, including outdoor exercise, and the

substantial risks of serious harm this poses to Mr. Saleh's physical and mental health,

safety and well-being by continuing to subject him to an unconstitutional exercise

regime, and they have failed to take corrective action despite that knowledge of

substantial risks of serious harm.

*Facts for Claim 3, 4, 5 and 6: Restrictions on Mr. Saleh in Violation of the Religious Freedom Restoration Act (RFRA), the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.*

65. BOP Program Statement P5360.09 states that all federal prisons "provide inmates of all

faith groups with reasonable and equitable opportunities to pursue religious beliefs and

practices."

66.  Despite this policy, Mr. Saleh has been deprived of the opportunity to practice his

religious beliefs.

67. Mr. Saleh is a practitioner of Islam and his religious beliefs are sincerely held.

68. In exercise of his sincerely held religious beliefs, Mr. Saleh is required to pray at least

five times per day at prescribed times.  Plaintiff subscribes to the practice of Azan, also

known as the "call to prayer."  Azan is a prayer chanted by at least one practitioner of

Islam within hearing distance of other Muslims immediately preceding each of the five prescribed daily prayers.

69. Azan is an exercise of and compelled by Plaintiff's sincerely held religious beliefs.  Mr. Saleh sincerely believes that the practice of Azan is fundamental to his religion and religious exercise.

70. Mr. Saleh is not afforded adequate opportunities to hear the prayer of Azan. Defendants Wiley, Cruz, Shartle/Munson, Gomez, Collins, Knox, Church, Sudlow, Powley, Law, Johnson and Reilley have and continue to substantially burden Plaintiff's exercise of religion, his religious exercise of Azan, by banning and limiting the performance of Azan.  Defendants have reprimanded Muslim prisoners for reciting Azan and continue to threaten them with disciplinary action for performing the prayer in conformance with their sincerely held beliefs.

71. On the J-Unit, Mr. Saleh and other Muslim prisoners are prohibited from performing the prayer of Azan at all.  Corrections officers threaten prisoners on J-Unit with incident reports if they perform the prayer of Azan, which could lead to termination of the prisoner's continued eligibility for and placement in the Step-Down Unit Program.

72. Previously, when Mr. Saleh was housed in the D-Unit, Defendant Sudlow prohibited the prayer of Azan altogether for a period of time.

73. The burdens on Plaintiff's religious exercise described above fail to further a compelling government interest or otherwise are not the least restrictive means of furthering a compelling government interest.

74. To exercise his sincerely held religious beliefs, Mr. Saleh requires frequent, regular and consistent access to an Imam, a Muslim religious leader, and to be able to communicate and consult with the Imam privately.

75. Frequent, regular and consistent access to an Imam for private communications and consultation is necessary to the exercise of and compelled by Mr. Saleh's sincerely held religious beliefs.  Mr. Saleh sincerely believes that such private communications and consultations with an Imam are fundamental and necessary to his religion and religious exercise.  Because personal and private spiritual and religious issues necessitating consultation with an Imam arise on an unpredictable and frequent basis, and Islam prohibits the discussion of certain personal and spiritual matters with or in the presence of others, including non-Muslims, the unavailability of an Imam with whom to confer and consult privately on a frequent basis substantially burdens Mr. Saleh's religious exercise.

76. Mr. Saleh does not have adequate access to an Imam.  An Imam is brought into the prison approximately two to three times a year.  In contrast, the ADX provides frequent, regular and consistent access to religious leaders for private consultation to prisoner faith groups other than Islam.  For example, there is a chaplain constantly on site and available for similarly situated Catholic and Christian prisoners at ADX.  The ADX also contracts with a Native American "medicine man," and a Rabbi is contracted to visit monthly with the Jewish prisoners.

77. On the rare occasions that an Imam is made available, however, Mr. Saleh has been required to leave his cell in order to speak with the Imam instead of the Imam coming to his cell.  Additionally, Mr. Saleh has been required to remain in full restraints, including

handcuffs, leg shackles, and a black box and Martin chain when removed from his cell to speak with an Imam.  Prisoners of other religious faiths at ADX are not required to consult with religious leaders outside of their cells in handcuffs and restraints.

78. On the rare occasions that an Imam is available, Mr. Saleh cannot have a private religious consultation with him.  A Muslim's ability to have a private spiritual consultation with his Imam is an essential tenet of Islam.  Plaintiff's visits with an Imam are always observed and subjected to visual and auditory monitoring by ADX Special Investigative Services (SIS) staff, the Chaplain and/or Chaplain's Assistant, and Defendant Johnson, an FBI agent.  Prisoners of other religious faiths in the ADX are permitted private conversations with their religious leaders.

79. The failure to provide Mr. Saleh with frequent, regular and consistent access to an Imam for private consultation substantially burdens his exercise of religion.

80. The burdens on Plaintiff's religious exercise as described above fail to further a compelling governmental interest or otherwise are not the least restrictive means of furthering a compelling governmental interest.

81. In exercise of his sincerely held religious beliefs, Mr. Saleh is required to maintain a Halal diet, a diet consisting of foods authorized and prepared as prescribed by Muslim law.

82. Maintaining a strictly Halal diet is an exercise of and compelled by Mr. Saleh's sincerely held religious belief.  Mr. Saleh sincerely believes that maintaining a strictly Halal diet is fundamental to his religion and religious exercise.

83. Mr. Saleh does not receive a Halal diet, which is a central tenet of Plaintiff's faith. Similarly situated prisoners of other religious faiths at ADX are given diets that are religiously acceptable in accordance with their faith.

84. Defendants Federal Bureau of Prisons, Vanyur, Wiley, Cruz, Javernick, Shartle/Munson, Church, Sudlow, Reilley, Powley, Law and Jones only afford Muslim prisoners such as Plaintiff a kosher diet or a "no pork" diet, neither of which conforms what is required by the Islamic faith. There are significant differences between a Halal diet and the diets offered Plaintiff at ADX: an Islamic prayer is not recited while slaughtering animals for meat; the offered meals are often cooked with gelatin and wine, which is prohibited under Islam; moreover, animal fat is often used in the offered meals, which is also forbidden by Islam. Eating the kosher meal and the no pork meal contravenes Islamic traditions and is considered sacrilegious by Muslims.

85. Halal items are not available for purchase in the commissary. In contrast, kosher items are available for similarly-situated Jewish prisoners.

86. Defendants Federal Bureau of Prisons, Vanyur, Wiley, Cruz, Javernick, Shartle/Munson, Reilley, Powley, Sudlow, Law and Jones substantially burden Mr. Saleh's exercise of religion by refusing to provide him with a nutritionally adequate and religiously acceptable Halal diet.

87. The burdens on Mr. Saleh's religious exercise described above fail to further a compelling governmental interest or otherwise are not the least restrictive means of further a compelling governmental interest.

88. In exercise of his sincerely held religious beliefs, Mr. Saleh is required to consult religious texts as prescribed by the Q'uran.

89. Mr. Saleh has been denied access to religious texts.  All Arabic and all Muslim books have been purged from the Chaplain's library, the leisure library, and the law library by Defendant Johnson.  Besides the Q'uran, there are six main books in the Sunni Muslim religion that are central tenets to the religion.  These books are collectively called the "Hadith."   The Hadith includes the books of the Sahih Bukhair, the Sahih Muslim, the Sunan al-Sughra, the Sunan Abi Da'ud, the Sunan al-Tirmidhi, and the Ibn Maja.  These books are essential to interpreting Islam.

90. Similarly situated prisoners of other religious faiths have access to religious texts that are central to their religions.

91. Defendants Federal Bureau of Prisons, Vanyur, Wiley, Cruz, Javernick, Shartle/Munson, Church, Sudlow, Powley, Law, and Reilley substantially burden Mr. Saleh's exercise of religion by refusing to provide him access to central religious texts such as the Hadith.

92. The burdens on Mr. Saleh's religious exercise described above fail to further a compelling governmental interest or otherwise are not the least restrictive means of further a compelling governmental interest.

93. In exercise of his sincerely held religious belief, Mr. Saleh is required to assemble together with other Muslims in performance of Jumu'ah, the mandatory congregate Muslim prayer, each Friday of every week.

94. Jumu'ah is an exercise of and compelled by Plaintiff's sincerely held religious beliefs. Mr. Saleh sincerely believes that the practice of Jumu'ah is fundamental to his religion and religious exercise.  Jumu'ah is among the most important tenets of Islam.

95. Defendants Federal Bureau of Prisons, Vanyur, Wiley, Cruz, Javernick, Shartle/Munson, Gomez, Collins, Knox, Church, Sudlow, Powley, Law, Reilley and Johnson have and continue to substantially burden Mr. Saleh's exercise of religion, his exercise of Jumu'ah, by banning and forbidding Mr. Saleh from performing Jumu'ah, the mandatory congregate Muslim prayer in conformance with his sincerely held religious beliefs.

96. The burdens on Mr. Saleh's religious exercise described above fail to further a compelling government interest or otherwise are not the least restrictive means of furthering a compelling government interest.

97. Defendants have refused to allow Mr. Saleh to finish his Master's Degree in Religious Studies from American Open University in Virginia  Mr. Saleh began pursuing his degree while he was housed in USP-Leavenworth via correspondence.  Although Mr. Saleh is only approximately ten credits away from earning his degree, Defendants have told him that continued participation in the program was prohibited because the correspondence is in Arabic.

98. The denial of these religious freedoms, both individually and combined, result in illegal burdens on Plaintiff's religious rights.

### Claims

**CLAIM 1:** *Defendants Violated Mr. Saleh's Fifth Amendment Rights to Due Process When Mr. Saleh Was Transferred to and Placed in ADX.*

99. Under the Fifth Amendment of the United States Constitution, Mr. Saleh may not be deprived of liberty without due process of law.

100. Mr. Saleh's conditions of confinement at ADX constitute a significant and atypical hardship, and are vastly harsher than the conditions of his previous placements and the ordinary incidents of prison life.

101. Mr. Saleh's placement in ADX implicates a liberty interest.

102. Defendants denied Mr. Saleh his Fifth Amendment right to due process when he was transferred to and placed in ADX without affording him meaningful notice of the reasons for his transfer and a hearing or other fair opportunity for rebuttal, and by arbitrarily, haphazardly, discriminately and erroneously placing him in ADX.

**CLAIM 2:** *Defendants Have Subjected Plaintiff to Cruel and Unusual Punishment in Violation of the Eighth Amendment by Denying Him Adequate Opportunity for Exercise*

103. By consistently depriving Mr. Saleh to regular access to sunlight and fresh air, Defendants have deprived Mr. Saleh of the minimal civilized measure of life necessities and exposed him to serious physical and mental harm.

104. By subjecting Mr. Saleh to such conditions, with full knowledge of the dangers that such conditions pose to his health, Defendants have acted, and will continue to act with deliberate indifference to the serious health needs of Mr. Saleh, and have subjected him to cruel and unusual punishment in violation of the Eighth Amendment.

**CLAIM 3**:  *Defendants Violated Plaintiff's Right to Practice His Religion Under RFRA, 42 U.S.C. § 2000(b)(b), et seq.*

.

105.  Mr. Saleh has a sincerely held belief in the religion of Islam.

106.  Defendants have substantially burdened the exercise of Mr. Saleh's religion.

107.  Defendants' restriction on Mr. Saleh's right to perform the prayer of Azan in his cell does not further a compelling governmental interest.

108.  Prohibiting Mr. Saleh from performing the prayer of Azan is not the least restrictive means of furthering any compelling governmental interest.

109.  Defendants' refusals to provide Mr. Saleh with meals that conform to a Halal diet does not further a compelling governmental interest.

110.  Denying Mr. Saleh Halal meals is not the least restrictive means of furthering any compelling governmental interest.

111.  Defendants' refusal to provide Mr. Saleh with religious texts does not further a compelling governmental interest.

112.  Denying Mr. Saleh religious texts is not the least restrictive means of furthering any compelling governmental interest.

113.  Defendants' refusal to provide Mr. Saleh with consistent or meaningful access to an Imam does not further a compelling governmental interest.

114.  Denying Mr. Saleh consistent and meaningful access to an Imam is not the least restrictive means of furthering any compelling governmental interest.

115.  Defendants' restrictions on Mr. Saleh's right to perform the congregate prayer of Jumu'ah does not further a compelling governmental interest.

116.  Prohibiting Mr. Saleh from performing the congregate prayer of Jumu'ah is not the least restrictive means of furthering any compelling governmental interest.

117.  Defendants' prohibition of Mr. Saleh's correspondence study for his Master's Degree in Religious Studies from American Open University does not further a compelling governmental interest.

118.  Defendants' refusal to allow Mr. Saleh to continue his correspondence course and complete his Master's Degree in Religious Studies from American Open University is not the least restrictive means of furthering any compelling governmental interest.

**CLAIM 4**:  *Religious Restrictions on Mr. Saleh in Violation of the Free Exercise Clause of the First Amendment.*

119.  Mr. Saleh has a sincerely held belief in the religion of Islam.

120.  The First Amendment protects the rights of all persons to freely exercise their religious beliefs.  It protects the right of Muslim prisoners to perform the prayer of Azan, also known as the "call to prayer."  Accordingly, the First Amendment protects the right of Mr. Saleh to perform the prayer of Azan.

121.  Defendants' denial of the right of prisoners at ADX to perform the prayer of Azan has no reasonable relationship to any penological interests.

122.  By denying Mr. Saleh the right to perform the prayer of Azan, Defendants have unjustifiably infringed on Mr. Saleh's right to the free exercise of religion, in violation of the First Amendment.

123. The First Amendment protects the right of Muslim prisoners to have regular and confidential access to an Islamic religious leader, known as an Imam. Accordingly, the First Amendment protects the right of Mr. Saleh to have access to an Imam.

124. Defendants' practice of denying Plaintiff the right to regular and confidential access to an Imam has no reasonable relationship to any penological interests.

125. By denying prisoners the right to regular and confidential access to an Imam, Defendants have unjustifiably infringed on Mr. Saleh's right to the free exercise of religion, in violation of the First Amendment.

126. The First Amendment protects the right of Muslim prisoners to have a Halal diet, as dictated in the Q'uran. Accordingly, the First Amendment protects the right of Mr. Saleh to have a Halal diet.

127. The policy and practice of Defendants of denying Muslim prisoners access to a Halal diet has no reasonable relationship to any penological interests.

128. By denying prisoners the right to a Halal diet, Defendants have unjustifiably infringed on Mr. Saleh's right to the free exercise of religion in violation of the First Amendment.

129. The First Amendment protects the right of Muslim prisoners to have access to books vital to the practice of their religion, such as the Hadith. Accordingly, the First Amendment protects the right of Mr. Saleh to have access to religious books, such as the Hadith.

130. Defendants' policy and practice of denying Plaintiff the right to religious books such as the Hadith has no reasonable relationship to any penological interests.

131.  By denying prisoners the right to religious books, such as the Hadith, Defendants have unjustifiably infringed on Mr. Saleh's right to the free exercise of religion, in violation of the First Amendment.

132.  The First Amendment protects the right of prisoners to perform the congregate prayer of Jumu'ah.  Accordingly, the First Amendment protects the right of Mr. Saleh to perform the congregate prayer of Jumu'ah.

133.  Defendants' policy and practice of denying prisoners the right to perform the congregate prayer of Jumu'ah has no reasonable relationship to any penological interests.

134.  By denying prisoners the right to perform the congregate prayer of Jumu'ah, Defendants have unjustifiably infringed on Mr. Saleh's right to the free exercise of religion, in violation of the First Amendment.

**CLAIM 5:**  *Violation of Mr. Saleh's Right to Equal Protection On the Basis of Religion Under the Fourteenth Amendment.*

135.  Defendants have denied Mr. Saleh the ability to perform the prayer of Azan, also known as the call to prayer.

136.  Similarly situated prisoners of other religious faiths in ADX are allowed to perform prayers important to their faith.

137.  Mr. Saleh has been denied regular and confidential access to an Islamic religious leader, known as an Imam.

138.  Similarly situated prisoners of other religious faiths in ADX are allowed regular and confidential access to religious leaders in accordance with their faith.

139.  Mr. Saleh has been denied access to an Islamic Halal diet.

140. Similarly situated prisoners of other religious faiths in ADX are given diets that accord with their religious faiths.

141. Mr. Saleh has been denied access to books vital to practicing his faith, such as the Hadith.

142. Similarly situated prisoners of other religious faiths in ADX are given access to books vital to their religious faiths.

143. The restrictions placed on Mr. Saleh regarding his religion are far more burdensome than the restrictions placed on prisoners of other faiths.

144. Defendants have intentionally discriminated against Mr. Saleh because of his belief in and adherence to the Islamic faith.

145. The difference in treatment of Mr. Saleh as a Muslim prisoner and prisoners of other faiths is not reasonably related to any penological interest.

**CLAIM 6:** *Violation of Mr. Saleh's Right to Equal Protection On the Basis of National Origin Under the Fourteenth Amendment.*

146. Plaintiff Saleh is a citizen of Jordan. His first language is Arabic.

147. Defendants have refused to permit Mr. Saleh to finish his correspondence study with American Open University in Arabic, which is necessary for him to complete his Master's Degree in Religious Studies from that institution.

148. Similarly situated prisoners of other national origins in ADX are permitted to correspond in their native languages/the language of their national origin.

149. Defendants have intentionally discriminated against Mr. Saleh because of his national origin.

150.  The difference in treatment does not further a compelling governmental interest.

151.  The difference in treatment is not the least restrictive means of furthering a compelling governmental interest.

### Prayer for Relief

Wherefore, Plaintiff requests the following relief:

a.  Mr. Saleh is entitled to a declaratory judgment that Defendants have deprived him of his protected liberty interest in freedom from the ADX supermax/solitary confinement regime without due process of law by arbitrarily, haphazardly, discriminately, and erroneously transferring him to and placing him in ADX without adequate notice of reasons and a hearing or other fair opportunity for rebuttal before an impartial decisionmaking body.  Mr. Saleh requests a permanent injunction enjoining Defendants from enforcing their policies and practices that led to Plaintiff's arbitrary, haphazard, discriminatory and erroneous ADX placement, and directing Defendants to promulgate and implement rules and regulations that provide inmates with adequate notice of reasons for ADX placement consideration, a hearing that includes at a minimum, a fair opportunity for rebuttal to an unbiased decision-making body before or within a reasonable time following an ADX placement decision.  Further, Mr. Saleh requests that Defendants provide him a fair hearing before an unbiased decision-making body concerning his placement in ADX.

b.  Mr. Saleh is entitled to a declaratory judgment that Defendants' failure to provide him with adequate, consistent and meaningful opportunity for outdoor exercise

constitutes cruel and unusual punishment in violation of the Eighth Amendment. Plaintiff also requests a permanent injunction directing Defendants to comply with their own policy requiring that inmates be provided out-of-cell exercise at least five days each week in increments totaling at least ten hours per week alternating between indoor and, weather permitting, outdoor exercise periods at times that Plaintiff may experience direct sunlight.

c.  Mr. Saleh is entitled to a declaration that the challenged policies and practices denying him his right to practice his religious beliefs violate RFRA, as well as a permanent injunction against their enforcement.

d.  Mr. Saleh is entitled to a declaration that the challenged policies and practices denying Mr. Saleh his right to practice his religious beliefs violates the Free Exercise Clause of the First Amendment, as well as a permanent injunction against their enforcement.

e.  Mr. Saleh is entitled to a declaration that the challenged policies and practices denying Mr. Saleh his rights to practice his religious beliefs violate the Equal Protection Clause of the Fourteenth Amendment, as well as a permanent injunction against their enforcement.

f.  Mr. Saleh is entitled to a declaration that the challenged policies and practices prohibiting him from corresponding with American Open University in Arabic violates the Equal Protection Clause of the Fourteenth Amendment, as well as a permanent injunction against their enforcement.

g.  Plaintiff requests the Court grant him his reasonable attorney's fees, expenses and

costs associated with this action.

h.  Plaintiff requests any additional or alternative relief as may be just, proper, and

equitable.


DATED:   June 15, 2007


Respectfully submitted,

STUDENT LAW OFFICE

_____s/ Laura L. Rovner_____
Laura L. Rovner
University of Denver Sturm College of Law
2255 E. Evans Ave., Denver, CO 80208
Telephone:  303.871.6140
Fax: 303.871.6847
E-mail: lrovner@law.du.edu
Counsel for Plaintiff Mohammed Saleh