## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-02467-EWN-KLM

**MOHAMMED SALEH,**

      Plaintiff,

v.

**FEDERAL BUREAU OF PRISONS,
MICHAEL MUKASEY, HARLEY LAPPIN,
JOYCE K. CONLEY, MICHAEL NALLEY,
RON WILEY, and MICHAEL MERRILL,
sued in their official capacities**

      Defendants.

---

Civil Action No. 06-cv-01747-EWN-KLM

**EL SAYYID A. NOSAIR,**

      Plaintiff,

v.

**FEDERAL BUREAU OF PRISONS,
MICHAEL MUKASEY, HARLEY LAPPIN,
JOYCE K. CONLEY, MICHAEL NALLEY,
RON WILEY, and MICHAEL MERRILL,
sued in their official capacities,**

      Defendants.

---

Civil Action No. 07-cv-00021-EWN-KLM

**IBRAHIM ELGABROWNY,**

      Plaintiff,

v.

**FEDERAL BUREAU OF PRISONS,**

**MICHAEL MUKASEY, HARLEY LAPPIN,**
**JOYCE K. CONLEY, MICHAEL NALLEY,**
**RON WILEY, and MICHAEL MERRILL,**
**sued in their official capacities,**

      Defendants.

---

### FIRST AMENDED CONSOLIDATED COMPLAINT

---

### Introduction

Plaintiffs Mohammed Saleh, El Sayyid Nosair, and Ibrahim Elgabrowny, who are incarcerated at the Administrative Maximum Security Prison ("ADX") in Florence, Colorado, by their attorneys, the Student Law Office, University of Denver Sturm College of Law, submit their first consolidated complaint for violations of the First, Fifth, and Eighth Amendments to the United States Constitution, and the Religious Freedom Restoration Act (RFRA).

### Jurisdiction and Venue

1   This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1346, 2201, and 2202.

2   Venue is proper within this district pursuant to 28 U.S.C. § 1391 as the majority of the Defendants reside here and the majority of the events giving rise to Plaintiffs' claims occurred in this judicial district.

### Parties

3   Plaintiff MOHAMMED SALEH is a prisoner in the custody of the United States Federal Bureau of Prisons, who has been continuously confined in ADX since February 2003.

4   Plaintiff EL-SAYYID NOSAIR is a prisoner in the custody of the United States

Federal Bureau of Prisons, who has been continuously confined in ADX since September of 2002.

5   Plaintiff IBRAHIM ELGABROWNY is a federal prisoner in the custody of the United States Bureau of Prisons, who has been continuously confined in ADX since August 2, 2002.

6   Defendant FEDERAL BUREAU OF PRISONS ("BOP") is an agency of the United States charged with the confinement of prisoners in federal prison facilities.

7   Defendant MICHAEL MUKASEY is the Attorney General of the United States. He serves as the chief law enforcement officer for the federal government, and is charged with ensuring public safety against threats foreign and domestic, and administering a fair system of federal justice.  The Attorney General is the person who is ultimate in charge of the Bureau of Prisons.

8   Defendant HARLEY LAPPIN is the Director of the BOP.  At all relevant times Defendant Lappin had decision making authority regarding transfer and placement  of prisoners in prisons operated by the BOP, such as ADX - Florence.

9   Defendant JOYCE K. CONLEY is the Assistant Director for the Correctional Programs Division of the BOP.  At all relevant times, Defendant Conley had the authority for administering national policies in the BOP, and administering educational programs, psychological services, and religious services in the BOP.

10  Defendant MICHAEL NALLEY is BOP Regional Director for the North Central Region.   At all relevant times Defendant Nalley had decision making authority regarding transfer and placement of prisoners in prisons operated by the BOP within the North Central Region, an area that includes Florence, Colorado.

3

11  Defendant RON WILEY is the Warden of ADX.  Defendant Wiley, as Warden, at all relevant times was responsible for the administration, operation, maintenance, policies, procedures and functions at ADX Florence, including decisions regarding an inmate's ability to participate in the step-down program and placement in a less restrictive unit, the ability of prisoners to practice their religious faith and the amount and type of exercise opportunities that a prisoner receives.

12  Defendant MICHAEL MERRILL is the Chaplain at ADX, responsible for managing the Religious Services Department at ADX, including all matters relating to the accommodation of prisoners' religious needs and activities.

13  Defendants Mukasey, Lappin, Nalley, Conley, Wiley, and Merrill are sued in their official capacities as employees or agents of the United States acting under color of federal law.

**Statement of Facts**

14  Presently, all Plaintiffs are all incarcerated in segregation at the United States Penitentiary -Administrative Maximum, in Florence, Colorado (ADX).

15  On September 11, 2001, then-Attorney General John Ashcroft directed Defendant BOP to remove all inmates who had previous to that day been designated as terrorists from general population and placed in administrative segregation until they could be investigated to determine whether they had any ties or prior knowledge of the events of that day.

16  In compliance with the directive of then-Attorney General, Defendant Lappin issued the order that all inmates who had been designated as terrorists, such as the Plaintiffs, be placed in administrative segregation so that the investigations could be carried out.

17  This directive by then-Attorney General and Defendant Lappin was implemented by Defendants Conley and Nalley in relation to the Plaintiffs, as well as other agents of the BOP in the institutions where Plaintiffs were confined.

18  Plaintiffs were removed from general population at the respective prisons in which they were confined on September 11, 2001 and were placed in administrative segregation pending an investigation.

19  Prior to September 11, 2001, on information and belief, Plaintiffs had been assigned to their respective prisons' general populations based on positive evaluations conducted by prison officials according to prison regulations.

20  Based upon prison policy, an assignment to a prison's general population requires a prisoner to demonstrate positive personal behavior and that he has received no prison disciplinary actions.

21  Prior to their being removed from general population and placed in administrative segregation on September 11, 2001 and then being placed in segregation at ADX, each Plaintiff had a clear conduct record.

22  While confined in segregation, Plaintiffs were treated in the same manner as they have been since being confined in segregation at ADX, such as being fed all meals along in their cells, being placed in belly chains and leg irons any time they are removed from their cells, exercising individually in cages, etc. *See infra* for a description of how the Plaintiffs have been treated at ADX while confined in general population.

23   On March 28, 2002, the United States Department of Justice issued a memorandum to "all regional directors regarding the handling of 'Pre-September 11th Terrorist Inmates."

24   On information and belief, both Defendants Lappin and Conley were involved in the creation of this memorandum and its implementation.

25   This memorandum stated that "[f]ollowing the terrorist events of September 11, 2002, inmates with possible knowledge of terrorist events or ties were placed in Administrative Detention until their cases would be thoroughly reviewed."

26   This memorandum went on to state that certain prisoners "are appropriate for transfer to [ADX], and in fact, most have already been referred for such transfer."  It directed the regional directors to "review a list of inmate names to determine whether they concur with the placement of such inmates at ADX."

27   Plaintiffs were not informed of the reasons for their removal from general population nor for their transfers to ADX and placement in segregation housing units, which are referred to by ADX as general population units.

28   These general population units at ADX did not provide the Plaintiffs the same rights and privileges as they had when they were confined in general population prior to September 11, 2001.

29   Defendants calling the cells that Plaintiffs were confined in at ADX general population instead of segregation is similar to the Defendants calling a dove a turkey. Or a grape an apple.  No matter how Defendants try to spruce up the name of the ADX's cells, they are still segregation cells.

30  It was not until the first part of 2007 that the Plaintiffs became aware that their removals from general population and placement into segregation and then into segregation at ADX was based upon their original convictions and their ethnicity.

31  In the first part of 2007, each of the Plaintiffs became aware of the decision in *Ajaj v. U.S.*, 2206 WL 3797871 (D. Colo. 2006), where the Hon. Marcia S. Krieger referenced the above memorandum.

32  As of the filing of this First Amended Consolidated Complaint, neither Defendants nor their agents have informed the Plaintiffs that the basis for their removals from general population, placements in segregation and then transfers to segregation at ADX was the attack of September 11, 2001, and Defendants' belief that Plaintiffs have a connection to terrorisms.

33  Plaintiffs were never informed of the result of the investigations that were the basis of their removals from general population and placements in administrative segregation, which conditions imposed an atypical and significant hardship in comparison to ordinary prison life of general population at their respective prisons.

34  In late 2002 or early 2003, each of the Plaintiffs was transferred to segregation at ADX – Florence.

35  On information and belief, during confinement in administrative segregation prior to their placements in segregation at ADX, none of the Plaintiffs demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution, or engaged in disruptive or assaultive behavior.

36  At the time of their transfers to segregation at ADX, none of the Plaintiffs were told

the reasons for their transfers to ADX.

37  Plaintiffs were not given notice, or informed of the reasons for their being placed in segregation and transfer to segregation at ADX, nor were they providing hearings or other opportunities to challenge such placements.

38  Plaintiffs did not meet the criteria for placement in segregation at ADX, such as being predatory or dangerous towards other inmates, staff or the public.

39  Until recently, Plaintiffs were not aware of the basis for their placements in segregation and transfers to segregation at ADX but assumed that it was related to their criminal convictions.

40  Based upon their conduct since being confined, Plaintiffs knew that their placements in segregation and transfers to segregation at ADX could not be due to their failure to get along with other inmates and prison staff, or for assaultive behavior.

41  These segregation placements were not based upon any new information that demonstrated an inability of the Plaintiffs to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution or for engaging in disruptive or assaultive behavior.

42  Once they arrived at ADX, Plaintiffs were then placed in so-called "general population" units within the administrative segregation complex.

43  Once they arrived at ADX, Plaintiffs were treated by prison staff as if they were sent to ADX for being assaultive or disruptive prisoners.

44  Plaintiffs were assigned to segregation units, which were the beginning of the Step-Down Unit program, even though Plaintiffs were not placed in ADX for being assaultive or disruptive prisoners.

45  According to BOP's Program Statement P5100.08, ADX's "general population" units are designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution."  Ch. 7, at 17.

46  Additionally, ADX is intended for those "[i]nmates with severe or chronic behavior problems that cannot be addressed in any other Bureau institution should be referred to ADX Florence general population, and those who are somewhat less problematic should be referred to USP Marion.  In describing the reasons underlying the referral, the Warden should explain why he or she has selected Marion or ADX Florence, respectively."  P5100.8, Ch. 7, at 18.

47  The conditions in general population (segregation) at ADX consists of Plaintiffs being confined to their individual cells for up to 23 hours a day for at least five days a week and the other two days being confined 24 hours a day.

48  Prior to Plaintiffs confinements in segregation pending investigations and then placements in segregation at ADX, they were confined to their cells for a maximum of 12 hours a day.

49  One of the conditions in "general population" at ADX consists of the Plaintiffs being fed their meals alone in their cells.

50  Prior to Plaintiffs being confined in segregation and then placed in segregation at ADX, Plaintiffs went to the chow hall to eat, in the company of other inmates, if they desired.

51  The conditions in general population at ADX require that when a Plaintiff is removed from his cell, that he be placed in belly chains and leg irons.

52  Prior to being confined in segregation and then placed in segregation at ADX, Plaintiffs were able to come and go from their cells without being placed in restraints.

53  The conditions in "general population" (segregation) at ADX state that Plaintiffs are to be provided out-of-cell exercise five days a week.  Due to staff shortages, however, Plaintiffs usually were given only two hours of exercise a week in a small cage, by themselves, with little if any exercise equipment provided.  For a two-month period, they were not allowed any outdoor exercise.

54  Prior to being confined in segregation and then being placed in segregation at ADX, Plaintiffs were able to engage in unlimited exercise, if desired, seven days a week in a huge yard area, with access to many different kinds of exercise equipment, and were allowed to exercise with other prisoners.

55  The conditions in "general population" (segregation) at ADX do not allow the Plaintiffs to hold jobs in jobs for UNICOR, but a few of the inmates in the housing unit may be able to have orderly jobs.

56  Prior to placement in segregation and then being placed in segregation at ADX, each Plaintiff held jobs in his respective prisons.

57  The conditions in ADX provide for almost no human contact for each Plaintiff except when staff are feeding them in their cells or escorting them out of their cells.

58  Prior to placements in segregation and then being placed in segregation at ADX, each Plaintiff was in regular general population and had daily contact with other inmates and staff for approximately 12 hours or more a day.

59  The conditions in segregation at ADX provide that inmates are not to converse with each other through their cell doors or other means.

60  Prior to placement in segregation and then in segregation at ADX, Plaintiffs were in regular general population and were not limited in the conversations that they were allowed to have.

61  The conditions as described in paragraphs 47, 49, 51, 53, 55, 57 and 59 are the same conditions Plaintiffs were subjected to when confined in segregation in their respective institutions pending investigations.

62  The conditions that Plaintiffs have been subjected to while confined in segregation and then in segregation at ADX imposed an atypical and significant hardship in relation to the ordinary incidents of prison life, and have worked and continue to work major disruptions in Plaintiffs' environments.

63  In determining the length of time Plaintiffs have been confined under conditions imposing an atypical and significant hardship in relation to the ordinary incidents of prison life, this Court is to aggregate the conditions of confinement in segregation at their respective institutions and in segregation at ADX.

64  As of the filing of this amended consolidated complaint, each of the Plaintiffs has been confined in segregation or ADX for over six years, or more than 2190 days. This calculation is based upon Plaintiffs being confined in segregation since September 11, 2001.

65  Since September 11, 2001, Plaintiffs have continuously been confined in segregation. This continuous confinement in segregation for over six years, by itself, creates an atypical hardship.

66  Each of the Plaintiffs is eligible for parole in the future.  Their continued confinement in ADX will adversely affect their parole consideration.

67  Plaintiff Saleh's earliest release date is in 2024.  Plaintiff Nosair has a life sentence. Plaintiff Elgabrowny;s release date is 2021.

68  On information and belief, Plaintiffs' confinements in segregation at ADX are likely to impact on the decision to release them.

69  On information and belief, there are inmates who have been confined in ADX since it was opened in 1995.

70  Plaintiffs' confinements in ADX is indefinite, in that, a Plaintiff cannot be released from ADX until he has demonstrated that he can be managed in a regular prison setting.

71  According to ADX's mission statement, prisoners are eligible to transfer out of ADX if they can progress through the Step-Down Program.

72  The following are the several factors that ADX's policy requires consideration of before an inmate can "step down," or progress, to a new housing assignment:

    (a) whether the inmate has actively participated in and completed programs recommended by his unit team;

    (b) the inmate's overall institutional adjustment, personal hygiene, and cell sanitation;

    (c) the inmate's interaction with staff; and

    (d) whether the factors which led to placement in ADX have been successfully mitigated.

73  Since Plaintiffs were not placed in ADX for any factors within their control, such as being assaultive or disruptive, Plaintiffs are not able to demonstrate that the reasons for ADX placement have been mitigated.

74  Further, since they have never been told why they were placed in segregation and then in segregation at ADX, Plaintiffs have not been able to challenge their removal

from general population for their continued confinements in segregation since September 11, 2001.

75 Even when confined in general population prior to September 11, 2001, Plaintiffs each met criteria 1-3, listed in paragraph 72.

76 Since Plaintiffs were not originally placed in ADX for being assaultive or disruptive, Plaintiffs have never been informed by Defendants or their agents how they can demonstrate improved behavior and the ability and motivation to reintegrate into an open population prison so that they can earn their way out of ADX.

77 Even though Plaintiffs were placed into ADX contrary to its own policies, Plaintiffs have complied with all of the above requirements for Step-Down with the exception of criterion four.

78 Plaintiff Nosair has not been placed in Step-Down as of the filing of this First Amended Consolidated Complaint.

79 During their confinements in segregation and ADX, Plaintiffs have not acted in any way that would suggest that they are security risks.

80 During their confinements in segregation and ADX, each Plaintiff has demonstrated good behavior and the ability and motivation to reintegrate into an open population setting and eventually transfer into a general population prison.

81 Plaintiff Elgabrowny has been incarcerated in ADX since August 2, 2002, and was not placed in the first-level of the Step-Down Unit program until July 19, 2007.

82 On information and belief, Defendants had Plaintiff Elgabrowny placed in the Step-Down Unit Program with the intent to moot his claim in this lawsuit as to his placement and continued confinement in ADX.

83  Plaintiff Saleh has been incarcerated in ADX since February, 2003, and was not placed in the first-level of the Step Down program until April 17, 2007.

84  On information and belief, Defendants had Plaintiff Saleh placed in the Step-Down Unit Program with the intent to moot his claim in this lawsuit as to his placement and continued confinement in ADX.

85  Plaintiff Nosair has been incarcerated in ADX since September, 2002, and has yet to be placed in the first-level of the Step Down program even though his behavior has been similar to Plaintiffs Elgabrowny and Saleh.

86  During their annual review for the Step-Down Unit Program, Plaintiffs were not afforded notices or hearings before being denied the opportunity to advance to the next level of the Step-Down Unit Program.

87  When Plaintiffs were given notice that they were denied for step-down, the only reason provided for denial was that "it is believed your reason for placement at the ADX has not been sufficiently mitigated."

88  It is impossible for Plaintiffs to challenge the denial of step-down when they were never told the basis for placements in segregation and then ADX.

89  If it is true that Plaintiffs were placed in segregation and then ADX due to their ethnicities, or their prior convictions, their liberty interests have been denied since these are circumstances that Plaintiffs cannot change nor mitigate.

90  The confinement of Plaintiffs in segregation and then ADX does not relate to nor further any penological interests that were not already being served by their confinement in general population prisons prior to September 11, 2001.

91  The conditions of confinement that Plaintiffs have been subjected to are extreme

when compared to the conditions that they were subjected to when confined in general population prisons prior to September 11, 2001.

92  Plaintiffs' placements in segregation for over six years is indefinite, and even though two of the Plaintiffs have been placed in the first phase of the Step-Down Unit program, they continue to suffer a violation of their liberty interests since they were not given due process prior to such placement in ADX or into the Step-Down Unit program.

93  Plaintiffs' placements in segregation will adversely affect their abilities to achieve release on parole when they are eligible.

94  On information and belief, there are no other prisoners who have been placed in indefinite segregation based on either their ethnicities or the nature of their convictions.

95  On information and belief, there are no other prisoners who have been placed in a behavior modification program, such as the Step-Down Unit Program, based either on their ethnicities or their criminal convictions.

96  Even though two of them Plaintiffs have been placed in the Step-Down Unit Program, their claims of violations of their liberty interests to due process continue since they are still confined at ADX.

97  It is Plaintiffs' contention that if they had been given notice, an opportunity to comment, and a decision to appeal, if necessary, that they could have challenged such indefinite confinements in segregation, which includes the Step-Down Unit Program. In other words, they would not be in the Step-Down Unit Program if their constitutional rights had not been violated when they were placed in ADX.

98  BOP Program Statement P5360.09 states that all federal prisons will "provide inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices."

99  Each of the Plaintiffs has a sincerely held belief in the religion of Islam.

100   An Islamic religious spiritual leader, an imam, is brought into the prison approximately two to three times a year.

101   For the past couple of years the Defendants have promised to provide an imam on a more regular basis but have failed to do so.

102   Providing access to an imam at the current rate is not adequate access to spiritual guidance.

103   A Muslim's ability to have a private spiritual consultation with his imam is an essential tenet of Islam.

104   Plaintiffs' visits with an imam are always observed and subjected to auditory monitoring by an interpreter from ADX's Special Investigative Services (SIS), the Chaplain's Assistant, and/or FBI Agent David Johnson.

105   Prisoners of other religions confined at ADX are not subject to the same observation and auditory monitoring as the Plaintiffs.

106   The prayer of Azan is a central tenet of the Plaintiffs' ability to express adherence to their faith, Islam.

107   Plaintiffs are not afforded adequate opportunities to perform the prayer of Azan, as known as the "call to prayer."

108   The inability to freely perform Azan significantly constrains the Plaintiffs from engaging in an activity that is fundamental to their religion.

109     Azan does not interfere with the good order and security of the prison. Defendants and their agents have repeatedly reprimanded each of the Plaintiffs and threatened them with disciplinary infractions for performing Azan.

110     For a period of time, the Unit Manager of Delta Unit, "FNU" Sudlow, prohibited Azan all together.

111     Defendants have forbidden Plaintiffs from performing Jumu'ah, the mandatory congregate Muslim prayer.

112     Jumu'ah is an important tenet of Islam and must be performed every Friday.

113     Plaintiffs do not receive an Islamic halal diet, which is a central tenet of Plaintiffs' faith.

114     Instead, the prison only affords Muslim prisoners such as these Plaintiffs, a kosher diet, which is prepared specifically for the Jewish faith.

115     There are significant differences between the halal and kosher diets: a different prayer is recited while slaughtering animals for meat; kosher food is often cooked with gelatin and wine, which is prohibited under Islam; moreover, animal fat is often used in kosher diets, which is forbidden by Islam.

116     Defendants have denied Plaintiffs access to books relating to Islam.

117     These books are essential to interpreting Islam, as is dictated by the paramount text of the Islamic faith, the Q'uran.

118     The denial of access to these books is the result of an exaggerated response to the good order and security of the prison.

119     Defendants have prohibited Plaintiffs from accessing on TV any religious programming in Arabic due to an exaggerated response to the good order and security

of the prison.

120     The Equal Protection clause of the Fifth Amendment of the United States Constitution requires that similarly situated persons be treated equally.

121     BOP Program Statement P5360.09 states that all federal prisons "provide inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices."

122     Each of the Plaintiffs has a sincerely held belief in the religion of Islam.

123     An Islamic religious spiritual leader, an imam, is brought into the prison approximately two to three times a year.

124     A full-time chaplain is employed at ADX for Christian prisoners to confer with on a weekly, if not daily, basis.

125     On the rare occasions that an imam is available, Plaintiffs cannot have a private religious consultation such as is afforded Christian prisoners.

126     A Muslim's ability to have a private spiritual consultation with his imam is an essential tenet of Islam.

127     Plaintiffs' visits with an imam are always observed and subjected to auditory monitoring by an interpreter from Special Investigative Services (SIS), the Chaplain's Assistant, and/or FBI Agent David Johnson.

128     On the rare occasions that an imam is available, Plaintiffs are often required to leave their cells in order to speak with the imam while placed in belly chains and leg irons.

129     Prisoners of other religious faiths, such as Christians and Jews, can consult with religious leaders in their cells, free of handcuffs and restraints.

130    Christian prisoners on the Delta Unit are given privacy when speaking with their religious leaders.

131    Plaintiffs are not given privacy when speaking with their religious leaders.

132    Plaintiffs do not receive an Islamic halal diet, which is a central tenet of Plaintiffs' faith.

133    Jewish prisoners in ADX are served a kosher diet upon request.

134    Non-Muslims had access to a variety of religious texts until a system-wide purge in February of 2007.

135    Plaintiffs had been denied Islamic texts long before the system-wide purge started this year.

136    These books are essential to interpreting Islam, as is dictated by the paramount text of the Islamic faith, the Q'uran.

137    Non-Muslims have access to closed-circuit religious programming in their native languages.

138    Defendants have prohibited Plaintiffs from accessing religious programming in Arabic.

139    Defendants have prohibited Plaintiffs from accessing religious programming in Arabic.

140    The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.

141    Plaintiffs have been subjected to extreme solitary confinement and reduced environmental stimulation within their respective prisons segregation units and within

the segregation units at ADX for over six years since September 11, 2001, without hope of release into a general population unit.

142     The denial of advancement to and through the Step-Down Unit program was done in an arbitrary and capricious manner.

143     Conditions at ADX are more restrictive than any other form of incarceration within the BOP system.

144     At ADX, Plaintiffs are confined to 8' x 12' concrete cells for at least 23 hours a day.

145     Defendants discourage Plaintiffs from verbal contact with other prisoners; Plaintiffs' cells are structured to curtail conversations between fellow prisoners. Moreover, Plaintiffs must exercise by themselves as well as take their meals alone in their cells.

146     These conditions deprive Plaintiffs of access to direct sunlight or natural light and adequate exercise.

147     Defendants limit Plaintiffs' opportunities to contact the outside world to two 15 minute telephone calls with an immediate family member per month and one brief non-contact social visit a month with an immediate family member separated by a thick piece of glass and through a telephone.

148     Due to the distances that the family members of the Plaintiffs must travel, they seldom, if ever, have visits or telephone calls.

149     Any time Plaintiffs are transported out of their cells they are subjected to extreme physical discomfort: they are subjected to an invasive strip search, they are not only handcuffed, but also shackled to chains protruding from a black box suspended by a

chain wrapped around their stomach, and they are shackled at the ankles.

150     Following each transport, Plaintiffs are strip-searched again.

151     Despite the severe psychological damage that can arise from these conditions, Defendants restrict Plaintiffs' access to mental health care to impersonal sessions conducted via television through a closed circuit signal.

152     The deliberate indifference of Defendants has resulted in Plaintiffs suffering deprivations that cause mental harms that go beyond the boundaries of what most human beings can psychologically tolerate.

153     Plaintiffs' prolonged and indefinite solitary confinement is causing them severe psychological damage, such that mental illness and mental incompetence threaten to debilitate them.

154     The lack of exercise, lack of contact with the outside world, lack of religious freedoms, and lack of human contact has further compounded the Plaintiffs' mental anguish, resulting in a wanton and unnecessary infliction of pain by Defendants.

155     Defendants have arbitrarily and capriciously denied Plaintiffs adequate exercise.

156     Usually, the Plaintiffs are allowed outdoor exercise only twice a week, one hour at a time.

157     In the past, these Defendants, and their agents, have prohibited any outdoor exercise for as long as two months.

158     When denied outdoor exercise, Defendants have not provided indoor exercise.

159     On the limited occasions when Defendants or their agents, have afforded Plaintiffs exercise, they require them to exercise in individual 10' x 10' dog-kennel-like cages with a chain-link fence on all sides, inside a large concrete basin.

160     These cages are so restrictive that Plaintiffs can walk no more than approximately six steps in any direction.

161     These conditions of outdoor exercise are sufficiently restrictive so as to deprive these plaintiffs of any meaningful opportunity to exercise.

162     Plaintiffs are not permitted access to direct sunlight during outdoor exercise.

163     On the few days they are offered outside exercise, it is only in the very early morning hours.

164     At this time, the sun is so low that direct sunlight does not reach above the walls of the concrete basin in which Plaintiffs are confined, thus preventing them from ever experiencing direct sunlight.

165     Each of the Plaintiffs suffers from a substantial risk of serious harm to their physical and mental well-being as a result of insufficient opportunities for exercise.

166     The indefinite length of Plaintiffs' solitary confinement and other conditions described above deprive Plaintiffs of basic life necessities, resulting in the infliction of cruel and unusual punishment.

## CAUSES OF ACTION

### Claim 1

### DEFENDANTS ACTIONS VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHT TO PRACTICE RELIGION

167     Plaintiffs reallege and incorporate Paragraphs 1 – 166.

168     The First Amendment to the United States Constitution allows the free exercise of religion.

169     Plaintiffs have sincerely held beliefs in the religion of Islam.

170     Defendants have violated Plaintiffs' First Amendment rights as described above.

**Claim 2**

**DEFENDANTS ACTIONS VIOLATED PLAINTIFFS'
RIGHT TO PRACTICE RELIGION IN ACCORANCE WITH RFRA**

171     Plaintiffs reallege and incorporate Paragraphs 1 – 166.

172     The Religious Freedom Restoration Act (RFRA) forbids the substantial burden of

religious exercise without compelling justification.

173     As described above, Defendants have substantially burdened the exercise of

Plaintiffs' religion.

**Claim 3**

**DEFENDANTS RESTRICTIONS ON PLAINTIFFS'
RELIGIOUS PRACTICES ARE IN VIOLATION
OF THE EQUAL PROTECTION CLAUSE**

174     Plaintiffs reallege and incorporate Paragraphs 1 – 166.

175     The Equal Protection Clause requires the equal treatment of similarly situated

persons.

176     Defendants do not allow Plaintiffs the same religious practice opportunities they

do non-Muslims in the same circumstances.

177     Defendants' failures to allow Plaintiffs religious access commensurate with

similarly situated prisoners at ADX is a violation of the Equal Protection clause.

**Claim 4**

**DEFENDANTS VIOLATED PLAINTIFFS' LIBERTY INTERESTS
NOT TO BE SUBJECTED TO AN ATYPICAL AND SIGNIFICANT
HARDSHIP IN RELATION TO ORDINARY PRISON LIFE.**

178     Plaintiffs reallege and incorporate Paragraphs 1 – 166.

179     Under the Fifth Amendment to the United States Constitution, Plaintiffs may not

be deprived of a liberty interest without due process of law.

180    Plaintiffs' placement in segregation began on September 11, 2001 and has continued through the filing of this amended consolidated complaint, and will continue into the future with no date set for its determination. *Jordan v. Federal Bureau of Prisons*, 191 F.3d 639, 649 (10th Cir. 2006), citing *Giano v. Selsky,* 238 F.3d 223, 226 (2nd Cir. 2001) (considering total aggregate period of administrative detention, given two periods of confinement at different facilities were based on the same administrative rationale).

181    This confinement in segregation for over six years has created an atypical and significant hardship in comparison to the ordinary prison life of the general populations where Plaintiffs were removed from. *See Estate of DiMarco v. Wyoming Dept. of Corrections, Div. Of Prisons*, 473 F.3d 1334 (10th Cir. 2007) (comparison of segregation to conditions in general population in determining whether atypical and significant hardship imposed; "She had access to the basic essentials of life, although her access to certain amenities was more limited than the general population." *Id*. at 1343.)

182    Further, Plaintiffs have never been told by the Defendants why they were removed from general population and have been kept confined in segregation for over six years.

183    None of the Plaintiffs were told why they were removed from general population; were given a hearing as why they were removed from general population; were told or given a hearing as to why they were moved from one segregation unit to the segregation unit at ADX; nor were they given reasons for such placements so that they could appeal this indefinite segregation.

184     Plaintiffs have been subjected to an atypical and significant hardship based upon their being confined in segregation for over six years. *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (whether 750 days in segregation imposed atypical and significant hardship in relation to the ordinary incidents of prison life); *Gaines v. Stenseng*, 292 F.3d 1222 (10th Cir. 2002) (remanded for court to determine whether 75 days confinement in disciplinary segregation is atypical).

185     Plaintiffs claim a liberty interest as to their placement in segregation due to their ethnicities and/or their criminal convictions after being imprisoned for approximately seven years and having not violated prison rules.

186     Plaintiffs claim a liberty interest as to their indefinite placements in segregation when other prisoners have not been placed in indefinite segregation based upon their ethnicities and/or criminal convictions.

187     Defendants' transfer of Plaintiffs to segregation was done in an arbitrary and capricious manner since they have never been told the basis for such transfers so that they could defend against it.

188     Defendants failed to provide the Plaintiffs with due process as to their being removed from general population, being confined indefinitely in segregation and for denying step-down for failure to mitigate the reasons for placement in segregation when they never were told why.

189     The placement of two of the Plaintiffs in the Step-Down Unit Program does not moot their claims since Plaintiffs are alleging that there were no justifiable reasons for removing them from general population in the first place and then to continuing to confine them in indefinite segregation.

190     For all of the reasons stated above, Plaintiffs had a liberty interest not to be removed from general population and placed in segregation when they were not violent inmates, such as the plaintiffs in *Wilkinson,* nor being subjected to disciplinary confinement, such as the plaintiff in *Sandin.*

191     For all of the reasons stated above, Plaintiffs had a liberty interest not to be kept confined indefinitely in segregation when the conditions imposed an atypical and significant hardship on the ordinary incidents of prison life, such confinement will impact on their parole eligibilities, and they are placed their indefinitively.

### Claim 5

### PLAINTIFFS HAD A LIBERTY INTEREST NOT BE DENIED STEP-DOWN FOR FAILURE TO MITIGATE THE REASONS FOR THEIR PLACEMENT IN SEGREGATION.

192     Plaintiffs reallege and incorporate Paragraphs 1 – 166.

193     Defendants denied step-down to the Plaintiffs for failure to mitigate the reasons for their placement in segregation.

194     Since Plaintiffs were never told the reasons for their placement in segregation, they could not challenge that denial.

195     Defendants' delays and failure in placing Plaintiffs in the Step Down Unit program implicates a liberty interest in transitioning out of ADX.

196     Defendants denied Plaintiffs due process when they continued to confine Plaintiffs in ADX without meaningful rights to participate in the decision-making processes regarding their placements in the Step Down Unit Program.

197     In denying Plaintiffs placement in the Step Down Unit program, Defendants and their agents acted in an arbitrary and capricious manner.

**Claim 6**

**DEFENDANTS SUBJECTED THE PLAINTIFFS TO A
VIOLATION OF THEIR EIGHTH AMENDMENT RIGHTS**

198     Plaintiffs reallege and incorporate Paragraphs 1 – 166.

199     The Eighth Amendment to the United States Constitution forbids cruel and

unusual punishment.

200     Plaintiffs' indefinite solitary confinement constitutes cruel and unusual

punishment when it impacts on their mental health.

201     In limiting Plaintiffs access to sunlight and fresh air, and by limiting their

opportunities for exercise to sporadic and infrequent exercise within 10' by 10' cages,

Defendants have deprived Plaintiffs of the minimal civilized measure of life's

necessities and exposed them to serious physical and mental harm.

202     By subjecting Plaintiffs to such conditions, with knowledge of the dangers that

such conditions pose, Defendants have acted, and continue to act, with deliberate

indifference and subject Plaintiffs to cruel and unusual punishment.

203     The indefinite length of Plaintiffs' solitary confinement and other conditions

described above deprive Plaintiffs of basic life necessities, resulting in the infliction

of cruel and unusual punishment.

**Prayer for Relief**

Wherefore, Plaintiffs respectfully request this Court grant the following relief:

A          Plaintiffs are entitled to a declaration that the challenged policies and practices

denying Plaintiffs their rights to practice their religious beliefs violate the First

Amendment to the United States Constitution and the Religious Freedom Restoration Act

and as a permanent injunction against these restrictions.

B        Plaintiffs are entitled to a declaration that the challenged policies and practices denying Plaintiffs rights to practice their religious beliefs in a commensurate manner with similarly situated non-Muslim prisoners violate the Fifth Amendment to the United States Constitution and request that a permanent injunction be issued against these violations.

C        Plaintiffs are entitled to a declaratory judgment that Defendants have deprived them of a liberty interest without due process of law in their placement in indefinite segregation and a permanent injunction to return them to their former status.

D        Plaintiffs are entitled to a declaratory judgment that Defendants have deprived them of a liberty interest without due process of law in their continued delays and denials of participation in the decision-making process regarding their placements in the Step-Down Program, as well a permanent injunction to give them proper credit for such arbitrary and capricious denial of entry into the Step Down program.

E        Plaintiffs are entitled to a declaratory judgment that Defendants' policies and practices subjecting Plaintiffs to prolonged and indefinite solitary confinement, along with little exercise, which both conditions impacting on their mental health, violates the Eighth Amendment and a permanent injunction against these practices.

F        Plaintiffs also request the Court grant them their reasonable attorney's fees, expenses and costs.

H        Plaintiffs also request any additional or alternative relief as may be just, proper, and equitable.

Dated:  November 23, 2007.

Respectfully submitted,

STUDENT LAW OFFICE

s/ Daniel Manville
Daniel Manville
University of Denver Sturm College of Law
2255 East Evans Avenue, Suite 335
Denver, CO 80208
Tel: 303-871-6140
Fax:  303.871.6847
Email:  dmanville@law.du.edu
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certified that on              , I electronically filed the foregoing with the Clerk of the Court using the ECF system which will serve a copy of the foregoing on the following: Michael C. Johnson and Marcy Cook, Attorneys for the Defendants, United States Attorney's Office, 1225 Seventeenth St., Ste. 700, Denver, Colorado 80202.

/s/Daniel E. Manville
Daniel E. Manville