**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 05-cv-02467-PAB-KLM

**MOHAMMED SALEH,**

      Plaintiff,

v.

**FEDERAL BUREAU OF PRISONS,**
**MICHAEL MUKASEY, HARLEY LAPPIN,**
**JOYCE K. CONLEY, MICHAEL NALLEY,**
**RON WILEY, and MICHAEL MERRILL,**
**sued in their official capacities**

      Defendants.

Civil Action No. 06-cv-01747-PAB-KLM

**EL SAYYID A. NOSAIR,**

      Plaintiff,

v.

**FEDERAL BUREAU OF PRISONS,**
**MICHAEL MUKASEY, HARLEY LAPPIN,**
**JOYCE K. CONLEY, MICHAEL NALLEY,**
**RON WILEY, and MICHAEL MERRILL,**
**sued in their official capacities,**

      Defendants.

Civil Action No. 07-cv-00021-PAB-KLM

**IBRAHIM ELGABROWNY,**

      Plaintiff,

v.

**FEDERAL BUREAU OF PRISONS,
MICHAEL MUKASEY, HARLEY LAPPIN,
JOYCE K. CONLEY, MICHAEL NALLEY,
RON WILEY, and MICHAEL MERRILL,
sued in their official capacities,**

        Defendants.

---

## SECOND AMENDED CONSOLIDATED COMPLAINT

### Introduction

Plaintiffs Mohammed Saleh, El Sayyid Nosair, and Ibrahim Elgabrowny, who are incarcerated at the Administrative Maximum Security Prison ("ADX") in Florence, Colorado, by their attorneys, the Student Law Office, University of Denver Sturm College of Law, submit their Second Amended Consolidated Complaint for violations of the First, Fifth, and Eighth Amendments to the United States Constitution, and the Religious Freedom Restoration Act (RFRA).

### Jurisdiction and Venue

1.     This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 1346, 2201, and 2202.

2.     Venue is proper within this district pursuant to 28 U.S.C. § 1391 as the majority of the Defendants reside here and the majority of the events giving rise to Plaintiffs' claims occurred in this judicial district.

### Parties

3.     Plaintiff MOHAMMED SALEH is a prisoner in the custody of the United States Federal Bureau of Prisons, who has been continuously confined in ADX since February 2003.

4.      Plaintiff EL-SAYYID NOSAIR is a prisoner in the custody of the United States Federal

Bureau of Prisons, who has been continuously confined in ADX since

September of 2002.

5.      Plaintiff IBRAHIM ELGABROWNY is a federal prisoner in the custody of the United

States Bureau of Prisons, who has been continuously confined in ADX since

August 2, 2002.

6.      Defendant FEDERAL BUREAU OF PRISONS ("BOP") is an agency of the United

States charged with the confinement of prisoners in federal prison facilities.

7.      Defendant MICHAEL MUKASEY is the Attorney General of the United States. He

serves as the chief law enforcement officer for the federal government, and is charged

with ensuring public safety against threats foreign and domestic, and administering a fair

system of federal justice. The Attorney General is the person who is ultimate in charge of

the Bureau of Prisons.

8.      Defendant HARLEY LAPPIN is the Director of the BOP. At all relevant times Defendant

Lappin had decision making authority regarding transfer and placement of prisoners in

prisons operated by the BOP, such as ADX - Florence.

9.      Defendant JOYCE K. CONLEY is the Assistant Director for the Correctional Programs

Division of the BOP. At all relevant times, Defendant Conley had the authority for

administering national policies in the BOP, and administering educational programs,

psychological services, and religious services in the BOP.

10.     Defendant MICHAEL NALLEY is BOP Regional Director for the North Central Region.

At all relevant times Defendant Nalley had decision making authority regarding transfer

and placement of prisoners in prisons operated by the BOP within the North Central Region, an area that includes Florence, Colorado.

11.     Defendant RON WILEY is the Warden of ADX. Defendant Wiley, as Warden, at all relevant times was responsible for the administration, operation, maintenance, policies, procedures and functions at ADX Florence, including decisions regarding an inmate's ability to participate in the step-down program and placement in a less restrictive unit, the ability of prisoners to practice their religious faith and the amount and type of exercise opportunities that a prisoner receives.

12.     Defendant MICHAEL MERRILL is the Chaplain at ADX, responsible for managing the Religious Services Department at ADX, including all matters relating to the accommodation of prisoners' religious needs and activities.

13.     Defendants Mukasey, Lappin, Nalley, Conley, Wiley, and Merrill are sued in their official capacities as employees or agents of the United States acting under color of federal law.

**Statement of Facts**

14.     Presently, all Plaintiffs are all incarcerated in segregation at the United States Penitentiary -Administrative Maximum, in Florence, Colorado (ADX).

15.      On September 11, 2001, then-Attorney General John Ashcroft directed Defendant BOP to remove all inmates who had previous to that day been designated as terrorists from general population and placed in administrative segregation until they could be investigated to determine whether they had any ties or prior knowledge of the events of that day.

4

16.  In compliance with the directive of then-Attorney General, Defendant Lappin issued the order that all inmates who had been designated as terrorists, such as the Plaintiffs, be placed in administrative segregation so that the investigations could be carried out.

17.  This directive by then-Attorney General and Defendant Lappin was implemented by Defendants Conley and Nalley in relation to the Plaintiffs, as well as other agents of the BOP in the institutions where Plaintiffs were confined.

18.  Plaintiffs were removed from general population at the respective prisons in which they were confined on September 11, 2001 and were placed in administrative segregation pending an investigation.

19.  Prior to September 11, 2001, on information and belief, Plaintiffs had been assigned to their respective prisons' general populations based on positive evaluations conducted by prison officials according to prison regulations.

20.  Based upon prison policy, an assignment to a prison's general population requires a prisoner to demonstrate positive personal behavior and that he has received no prison disciplinary actions.

21.  Prior to their being removed from general population and placed in administrative segregation on September 11, 2001 and then being placed in segregation at ADX, each Plaintiff had a clear conduct record.

22.  While confined in segregation, Plaintiffs were treated in the same manner as they have been since being confined in segregation at ADX, such as being fed all meals along in their cells, being placed in belly chains and leg irons any time they are removed from their cells, exercising individually in cages, etc. *See infra* for a description of how the Plaintiffs have been treated at ADX while confined in general population.

23.     On March 28, 2002, the United States Department of Justice issued a memorandum to "all regional directors regarding the handling of 'Pre-September 11th Terrorist Inmates."

24.     On information and belief, both Defendants Lappin and Conley were involved in the creation of this memorandum and its implementation.

25.     This memorandum stated that "[f]ollowing the terrorist events of September 11, 2002, inmates with possible knowledge of terrorist events or ties were placed in Administrative Detention until their cases would be thoroughly reviewed."

26.     This memorandum went on to state that certain prisoners "are appropriate for transfer to [ADX], and in fact, most have already been referred for such transfer." It directed the regional directors to "review a list of inmate names to determine whether they concur with the placement of such inmates at ADX."

27.     Plaintiffs were not informed of the reasons for their removal from general population nor for their transfers to ADX and placement in segregation housing units, which are referred to by ADX as general population units.

28.     These general population units at ADX did not provide the Plaintiffs the same rights and privileges as they had when they were confined in general population prior to September 11, 2001.

29.     Defendants calling the cells that Plaintiffs were confined in at ADX general population instead of segregation is similar to the Defendants calling a dove a turkey. Or a grape an apple. No matter how Defendants try to spruce up the name of the ADX's cells, they are still segregation cells.

30.     It was not until the first part of 2007 that the Plaintiffs became aware that their removals from general population and placement into segregation and then into segregation at ADX was based upon their original convictions and their ethnicity.

31.     In the first part of 2007, each of the Plaintiffs became aware of the decision in *Ajaj v. U.S.*, 2206 WL 3797871 (D. Colo. 2006), where the Hon. Marcia S. Krieger referenced the above memorandum.

32.     As of the filing of this First Amended Consolidated Complaint, neither Defendants nor their agents have informed the Plaintiffs that the basis for their removals from general population, placements in segregation and then transfers to segregation at ADX was the attack of September 11, 2001, and Defendants' belief that Plaintiffs have a connection to terrorisms.

33.     Plaintiffs were never informed of the result of the investigations that were the basis of their removals from general population and placements in administrative segregation, which conditions imposed an atypical and significant hardship in comparison to ordinary prison life of general population at their respective prisons.

34.     In late 2002 or early 2003, each of the Plaintiffs was transferred to segregation at ADX – Florence.

35.     On information and belief, during confinement in administrative segregation prior to their placements in segregation at ADX, none of the Plaintiffs demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution, or engaged in disruptive or assaultive behavior.

36.     At the time of their transfers to segregation at ADX, none of the Plaintiffs were told the reasons for their transfers to ADX.

37.     Plaintiffs were not given notice, or informed of the reasons for their being placed in segregation and transfer to segregation at ADX, nor were they providing hearings or other opportunities to challenge such placements.

38.     Plaintiffs did not meet the criteria for placement in segregation at ADX, such as being predatory or dangerous towards other inmates, staff or the public.

39.     Until recently, Plaintiffs were not aware of the basis for their placements in segregation and transfers to segregation at ADX but assumed that it was related to their criminal convictions.

40.     Based upon their conduct since being confined, Plaintiffs knew that their placements in segregation and transfers to segregation at ADX could not be due to their failure to get along with other inmates and prison staff, or for assaultive behavior.

41.     These segregation placements were not based upon any new information that demonstrated an inability of the Plaintiffs to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution or for engaging in disruptive or assaultive behavior.

42.     Once they arrived at ADX, Plaintiffs were then placed in so-called "general population" units within the administrative segregation complex.

43.     Once they arrived at ADX, Plaintiffs were treated by prison staff as if they were sent to ADX for being assaultive or disruptive prisoners.

44.     Plaintiffs were assigned to segregation units, which were the beginning of the Step-Down Unit program, even though Plaintiffs were not placed in ADX for being assaultive or disruptive prisoners.

45.    According to BOP's Program Statement P5100.08, ADX's "general population" units are designed for male inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others or to the secure and orderly operation of the institution." Ch. 7, at 17.

46.    Additionally, ADX is intended for those "[i]nmates with severe or chronic behavior problems that cannot be addressed in any other Bureau institution should be referred to ADX Florence general population, and those who are somewhat less problematic should be referred to USP Marion. In describing the reasons underlying the referral, the Warden should explain why he or she has selected Marion or ADX Florence, respectively." P5100.8, Ch. 7, at 18.

47.    The conditions in general population (segregation) at ADX consists of Plaintiffs being confined to their individual cells for up to 23 hours a day for at least five days a week and the other two days being confined 24 hours a day.

48.    Prior to Plaintiffs confinements in segregation pending investigations and then placements in segregation at ADX, they were confined to their cells for a maximum of 12 hours a day.

49.    One of the conditions in "general population" at ADX consists of the Plaintiffs being fed their meals alone in their cells.

50.    Prior to Plaintiffs being confined in segregation and then placed in segregation at ADX, Plaintiffs went to the chow hall to eat, in the company of other inmates, if they desired.

51.    The conditions in general population at ADX require that when a Plaintiff is removed from his cell, that he be placed in belly chains and leg irons.

52.     Prior to being confined in segregation and then placed in segregation at ADX, Plaintiffs were able to come and go from their cells without being placed in restraints.

53.     The conditions in "general population" (segregation) at ADX state that Plaintiffs are to be provided out-of-cell exercise five days a week. Due to staff shortages, however, Plaintiffs usually were given only two hours of exercise a week in a small cage, by themselves, with little if any exercise equipment provided. For a two-month period, they were not allowed any outdoor exercise.

54.     Prior to being confined in segregation and then being placed in segregation at ADX, Plaintiffs were able to engage in unlimited exercise, if desired, seven days a week in a huge yard area, with access to many different kinds of exercise equipment, and were allowed to exercise with other prisoners.

55.     The conditions in "general population" (segregation) at ADX do not allow the Plaintiffs to hold jobs in jobs for UNICOR, but a few of the inmates in the housing unit may be able to have orderly jobs.

56.     Prior to placement in segregation and then being placed in segregation at ADX, each Plaintiff held jobs in his respective prisons.

57.     The conditions in ADX provide for almost no human contact for each Plaintiff except when staff are feeding them in their cells or escorting them out of their cells.

58.     Prior to placements in segregation and then being placed in segregation at ADX, each Plaintiff was in regular general population and had daily contact with other inmates and staff for approximately 12 hours or more a day.

59.     The conditions in segregation at ADX provide that inmates are not to converse with each other through their cell doors or other means.

60.     Prior to placement in segregation and then in segregation at ADX, Plaintiffs were in regular general population and were not limited in the conversations that they were allowed to have.

61.     The conditions as described in paragraphs 47, 49, 51, 53, 55, 57 and 59 are the same conditions Plaintiffs were subjected to when confined in segregation in their respective institutions pending investigations.

62.     The conditions that Plaintiffs have been subjected to while confined in segregation and then in segregation at ADX imposed an atypical and significant hardship in relation to the ordinary incidents of prison life, and have worked and continue to work major disruptions in Plaintiffs' environments.

63.     In determining the length of time Plaintiffs have been confined under conditions imposing an atypical and significant hardship in relation to the ordinary incidents of prison life, this Court is to aggregate the conditions of confinement in segregation at their respective institutions and in segregation at ADX.

64.     As of the filing of this amended consolidated complaint, each of the Plaintiffs has been confined in segregation or ADX for over six years, or more than 2190 days.[1] This calculation is based upon Plaintiffs being confined in segregation since September 11, 2001.

_____

[1] This calculation is based upon the date of filing of the First Amended Consolidated Complaint in this action, January 11, 2008.  See Doc. 144.  Pursuant to the Order of this Court, dated January 22, 2009, that "[n]o further additions, deletions, or changes shall be permitted" other than the revisions set forth at Paragraphs 167-182 and 203, infra, neither a recalculation of this amount of time nor any other revisions other than those permitted by this Court's Order have been made, apart from non-substantive modifications such as the substitution of the initials of Judge Philip A. Brimmer in the Plaintiffs' case numbers, a new signature block and certificate of service, and the appropriate re-numbering of paragraphs and paragraph references.

65.     Since September 11, 2001, Plaintiffs have continuously been confined in segregation. This continuous confinement in segregation for over six years, by itself, creates an atypical hardship.

66.     Each of the Plaintiffs is eligible for parole in the future. Their continued confinement in ADX will adversely affect their parole consideration.

67.     Plaintiff Saleh's earliest release date is in 2024. Plaintiff Nosair has a life sentence. Plaintiff Elgabrowny;s release date is 2021.

68.     On information and belief, Plaintiffs' confinements in segregation at ADX are likely to impact on the decision to release them.

69.     On information and belief, there are inmates who have been confined in ADX since it was opened in 1995.

70.     Plaintiffs' confinements in ADX is indefinite, in that, a Plaintiff cannot be released from ADX until he has demonstrated that he can be managed in a regular prison setting.

71.     According to ADX's mission statement, prisoners are eligible to transfer out of ADX if they can progress through the Step-Down Program.

72.     The following are the several factors that ADX's policy requires consideration of before an inmate can "step down," or progress, to a new housing assignment:

(a)  whether the inmate has actively participated in and completed programs recommended by his unit team;

(b) the inmate's overall institutional adjustment, personal hygiene, and cell sanitation;

(c) the inmate's interaction with staff; and

(d) whether the factors which led to placement in ADX have been successfully mitigated.

73.     Since Plaintiffs were not placed in ADX for any factors within their control, such as being assaultive or disruptive, Plaintiffs are not able to demonstrate that the reasons for ADX placement have been mitigated.

74.     Further, since they have never been told why they were placed in segregation and then in segregation at ADX, Plaintiffs have not been able to challenge their removal from general population for their continued confinements in segregation since September 11, 2001.

75.     Even when confined in general population prior to September 11, 2001, Plaintiffs each met criteria 1-3, listed in paragraph 72.

76.     Since Plaintiffs were not originally placed in ADX for being assaultive or disruptive, Plaintiffs have never been informed by Defendants or their agents how they can demonstrate improved behavior and the ability and motivation to reintegrate into an open population prison so that they can earn their way out of ADX.

77.     Even though Plaintiffs were placed into ADX contrary to its own policies, Plaintiffs have complied with all of the above requirements for Step-Down with the exception of criterion four.

78.     Plaintiff Nosair has not been placed in Step-Down as of the filing of this First Amended Consolidated Complaint.

79.     During their confinements in segregation and ADX, Plaintiffs have not acted in any way that would suggest that they are security risks.

80.     During their confinements in segregation and ADX, each Plaintiff has demonstrated good behavior and the ability and motivation to reintegrate into an open population setting and eventually transfer into a general population prison.

81.     Plaintiff Elgabrowny has been incarcerated in ADX since August 2, 2002, and was not placed in the first-level of the Step-Down Unit program until July 19, 2007.

82.     On information and belief, Defendants had Plaintiff Elgabrowny placed in the Step-Down Unit Program with the intent to moot his claim in this lawsuit as to his placement and continued confinement in ADX.

83.     Plaintiff Saleh has been incarcerated in ADX since February, 2003, and was not placed in the first-level of the Step Down program until April 17, 2007.

84.     On information and belief, Defendants had Plaintiff Saleh placed in the Step-Down Unit Program with the intent to moot his claim in this lawsuit as to his placement and continued confinement in ADX.

85.     Plaintiff Nosair has been incarcerated in ADX since September, 2002, and has yet to be placed in the first-level of the Step Down program even though his behavior has been similar to Plaintiffs Elgabrowny and Saleh.

86.     During their annual review for the Step-Down Unit Program, Plaintiffs were not afforded notices or hearings before being denied the opportunity to advance to the next level of the Step-Down Unit Program.

87.     When Plaintiffs were given notice that they were denied for step-down, the only reason provided for denial was that "it is believed your reason for placement at the ADX has not been sufficiently mitigated."

88.     It is impossible for Plaintiffs to challenge the denial of step-down when they were never told the basis for placements in segregation and then ADX.

89.  If it is true that Plaintiffs were placed in segregation and then ADX due to their ethnicities, or their prior convictions, their liberty interests have been denied since these are circumstances that Plaintiffs cannot change nor mitigate.

90.  The confinement of Plaintiffs in segregation and then ADX does not relate to nor further any penological interests that were not already being served by their confinement in general population prisons prior to September 11, 2001.

91.  The conditions of confinement that Plaintiffs have been subjected to are extreme when compared to the conditions that they were subjected to when confined in general population prisons prior to September 11, 2001.

92.  Plaintiffs' placements in segregation for over six years is indefinite, and even though two of the Plaintiffs have been placed in the first phase of the Step-Down Unit program, they continue to suffer a violation of their liberty interests since they were not given due process prior to such placement in ADX or into the Step-Down Unit program.

93.  Plaintiffs' placements in segregation will adversely affect their abilities to achieve release on parole when they are eligible.

94.  On information and belief, there are no other prisoners who have been placed in indefinite segregation based on either their ethnicities or the nature of their convictions.

95.  On information and belief, there are no other prisoners who have been placed in a behavior modification program, such as the Step-Down Unit Program, based either on their ethnicities or their criminal convictions.

96.  Even though two of them Plaintiffs have been placed in the Step-Down Unit Program, their claims of violations of their liberty interests to due process continue since they are still confined at ADX.

97.     It is Plaintiffs' contention that if they had been given notice, an opportunity to comment, and a decision to appeal, if necessary, that they could have challenged such indefinite confinements in segregation, which includes the Step-Down Unit Program. In other words, they would not be in the Step-Down Unit Program if their constitutional rights had not been violated when they were placed in ADX.

98.     BOP Program Statement P5360.09 states that all federal prisons will "provide inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices."

99.     Each of the Plaintiffs has a sincerely held belief in the religion of Islam.

100.    An Islamic religious spiritual leader, an imam, is brought into the prison approximately two to three times a year.

101.    For the past couple of years the Defendants have promised to provide an imam on a more regular basis but have failed to do so.

102.    Providing access to an imam at the current rate is not adequate access to spiritual guidance.

103.    A Muslim's ability to have a private spiritual consultation with his imam is an essential tenet of Islam.

104.    Plaintiffs' visits with an imam are always observed and subjected to auditory monitoring by an interpreter from ADX's Special Investigative Services (SIS), the Chaplain's Assistant, and/or FBI Agent David Johnson.

105.    Prisoners of other religions confined at ADX are not subject to the same observation and auditory monitoring as the Plaintiffs.

106.    The prayer of Azan is a central tenet of the Plaintiffs' ability to express adherence to their faith, Islam.

107.    Plaintiffs are not afforded adequate opportunities to perform the prayer of Azan, as known as the "call to prayer."

108.    The inability to freely perform Azan significantly constrains the Plaintiffs from engaging in an activity that is fundamental to their religion.

109.    Azan does not interfere with the good order and security of the prison. Defendants and their agents have repeatedly reprimanded each of the Plaintiffs and threatened them with disciplinary infractions for performing Azan.

110.    For a period of time, the Unit Manager of Delta Unit, "FNU" Sudlow, prohibited Azan all together.

111.    Defendants have forbidden Plaintiffs from performing Jumu'ah, the mandatory congregate Muslim prayer.

112.    Jumu'ah is an important tenet of Islam and must be performed every Friday.

113.    Plaintiffs do not receive an Islamic halal diet, which is a central tenet of Plaintiffs' faith.

114.    Instead, the prison only affords Muslim prisoners such as these Plaintiffs, a kosher diet, which is prepared specifically for the Jewish faith.

115.    There are significant differences between the halal and kosher diets: a different prayer is recited while slaughtering animals for meat; kosher food is often cooked with gelatin and wine, which is prohibited under Islam; moreover, animal fat is often used in kosher diets, which is forbidden by Islam.

116.    Defendants have denied Plaintiffs access to books relating to Islam.

117.    These books are essential to interpreting Islam, as is dictated by the paramount text of the Islamic faith, the Q'uran.

118.    The denial of access to these books is the result of an exaggerated response to the good order and security of the prison.

119.    Defendants have prohibited Plaintiffs from accessing on TV any religious programming in Arabic due to an exaggerated response to the good order and security of the prison.

120.    The Equal Protection clause of the Fifth Amendment of the United States Constitution requires that similarly situated persons be treated equally.

121.    BOP Program Statement P5360.09 states that all federal prisons "provide inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices."

122.    Each of the Plaintiffs has a sincerely held belief in the religion of Islam.

123.    An Islamic religious spiritual leader, an imam, is brought into the prison approximately two to three times a year.

124.    A full-time chaplain is employed at ADX for Christian prisoners to confer with on a weekly, if not daily, basis.

125.    On the rare occasions that an imam is available, Plaintiffs cannot have a private religious consultation such as is afforded Christian prisoners.

126.    A Muslim's ability to have a private spiritual consultation with his imam is an essential tenet of Islam.

127.    Plaintiffs' visits with an imam are always observed and subjected to auditory monitoring by an interpreter from Special Investigative Services (SIS), the Chaplain's Assistant, and/or FBI Agent David Johnson.

128.  On the rare occasions that an imam is available, Plaintiffs are often required to leave their cells in order to speak with the imam while placed in belly chains and leg irons.

129.  Prisoners of other religious faiths, such as Christians and Jews, can consult with religious leaders in their cells, free of handcuffs and restraints.

130.  Christian prisoners on the Delta Unit are given privacy when speaking with their religious leaders.

131.  Plaintiffs are not given privacy when speaking with their religious leaders.

132.  Plaintiffs do not receive an Islamic halal diet, which is a central tenet of Plaintiffs' faith.

133.  Jewish prisoners in ADX are served a kosher diet upon request.

134.  Non-Muslims had access to a variety of religious texts until a system-wide purge in February of 2007.

135.  Plaintiffs had been denied Islamic texts long before the system-wide purge started this year.

136.  These books are essential to interpreting Islam, as is dictated by the paramount text of the Islamic faith, the Q'uran.

137.  Non-Muslims have access to closed-circuit religious programming in their native languages.

138.  Defendants have prohibited Plaintiffs from accessing religious programming in Arabic.

139.  Defendants have prohibited Plaintiffs from accessing religious programming in Arabic.

140.  The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.

141.  Plaintiffs have been subjected to extreme solitary confinement and reduced environmental stimulation within their respective prisons segregation units and within the

segregation units at ADX for over six years since September 11, 2001, without hope of release into a general population unit.

142. The denial of advancement to and through the Step-Down Unit program was done in an arbitrary and capricious manner.

143. Conditions at ADX are more restrictive than any other form of incarceration within the BOP system.

144. At ADX, Plaintiffs are confined to 8' x 12' concrete cells for at least 23 hours a day.

145. Defendants discourage Plaintiffs from verbal contact with other prisoners; Plaintiffs' cells are structured to curtail conversations between fellow prisoners. Moreover, Plaintiffs must exercise by themselves as well as take their meals alone in their cells.

146. These conditions deprive Plaintiffs of access to direct sunlight or natural light and adequate exercise.

147. Defendants limit Plaintiffs' opportunities to contact the outside world to two 15 minute telephone calls with an immediate family member per month and one brief non-contact social visit a month with an immediate family member separated by a thick piece of glass and through a telephone.

148. Due to the distances that the family members of the Plaintiffs must travel, they seldom, if ever, have visits or telephone calls.

149. Any time Plaintiffs are transported out of their cells they are subjected to extreme physical discomfort: they are subjected to an invasive strip search, they are not only handcuffed, but also shackled to chains protruding from a black box suspended by a chain wrapped around their stomach, and they are shackled at the ankles.

150. Following each transport, Plaintiffs are strip-searched again.

151.  Despite the severe psychological damage that can arise from these conditions, Defendants restrict Plaintiffs' access to mental health care to impersonal sessions conducted via television through a closed circuit signal.

152.  The deliberate indifference of Defendants has resulted in Plaintiffs suffering deprivations that cause mental harms that go beyond the boundaries of what most human beings can psychologically tolerate.

153.  Plaintiffs' prolonged and indefinite solitary confinement is causing them severe psychological damage, such that mental illness and mental incompetence threaten to debilitate them.

154.  The lack of exercise, lack of contact with the outside world, lack of religious freedoms, and lack of human contact has further compounded the Plaintiffs' mental anguish, resulting in a wanton and unnecessary infliction of pain by Defendants.

155.  Defendants have arbitrarily and capriciously denied Plaintiffs adequate exercise.

156.  Usually, the Plaintiffs are allowed outdoor exercise only twice a week, one hour at a time.

157.  In the past, these Defendants, and their agents, have prohibited any outdoor exercise for as long as two months.

158.  When denied outdoor exercise, Defendants have not provided indoor exercise.

159.  On the limited occasions when Defendants or their agents, have afforded Plaintiffs exercise, they require them to exercise in individual 10' x 10' dog-kennel like cages with a chain-link fence on all sides, inside a large concrete basin.

160.  These cages are so restrictive that Plaintiffs can walk no more than approximately six steps in any direction.

161.    These conditions of outdoor exercise are sufficiently restrictive so as to deprive these plaintiffs of any meaningful opportunity to exercise.

162.    Plaintiffs are not permitted access to direct sunlight during outdoor exercise.

163.    On the few days they are offered outside exercise, it is only in the very early morning hours.

164.    At this time, the sun is so low that direct sunlight does not reach above the walls of the concrete basin in which Plaintiffs are confined, thus preventing them from ever experiencing direct sunlight.

165.    Each of the Plaintiffs suffers from a substantial risk of serious harm to their physical and mental well-being as a result of insufficient opportunities for exercise.

166.    The indefinite length of Plaintiffs' solitary confinement and other conditions described above deprive Plaintiffs of basic life necessities, resulting in the infliction of cruel and unusual punishment.

167.    On or around September 25, 2008, Plaintiff Saleh and another inmate were attacked with a weapon by a third inmate in the USP-D/B unit at the United States Penitentiary-Florence, the unit in which ADX inmates in the third and final phase of the Step-Down Program are housed.

168.    Following this attack, Plaintiff Saleh was treated for multiple head lacerations and other injuries received, and immediately following this was removed from the USP-D/B unit and placed in the Special Housing Unit (SHU) at the ADX.

169.    On or around September 26, 2008, Plaintiff Saleh was issued an incident report that indicated that he had participated in a fight on September 25, 2008, but failed to set forth

any of the actions of his attacker, the use of a weapon against Plaintiff Saleh, or the injuries suffered by Plaintiff Saleh.

170.    On or around November 5, 2008, Plaintiff Saleh was adjudicated to be at fault in the attack, and a number of sanctions were consequently imposed upon him.  Plaintiff Saleh was removed from the Step-Down Program and returned to a "general population" cell at the ADX, despite the fact that this particular sanction was not referenced or indicated to occur anywhere in his adjudication or the report issued pursuant thereto.

171.    Multiple ADX personnel, including the Defendant Warden Ron Wiley, had verbally indicated to Plaintiff Saleh prior to his adjudication that the decision to remove him from the Step-Down Program had already been reached.

172.    On or around January 13, 2009, Plaintiff Saleh was issued a new incident report bearing the same date, in which the description of the attack had been revised to include the fact that Plaintiff Saleh had also been struck by his attacker.  The revised description of the attack in the second incident report did not refer to the fact that Plaintiff Saleh had been attacked without provocation, the nature of his injuries, or the use of a weapon by his attacker.

173.    Shortly after receiving the second incident report for the attack, Plaintiff Saleh was notified by an administrative remedy response dated January 5, 2009, from Defendant Regional Director Michael Nalley, that a "procedural error" had been committed in his first adjudication.  Plaintiff Saleh was not informed of the nature of the error referred to, nor was the error corrected in the second incident report issued to him.

174.   On Monday, January 26, 2009, counsel for Plaintiff Saleh wrote to counsel for Defendants by electronic mail, requesting to be present for the second adjudication of the attack on Plaintiff Saleh.  On Wednesday, January 28, 2009, counsel for Defendants responded that the second adjudication had occurred the prior morning.  On information and belief, adjudications of this nature at the ADX normally occur only on Wednesdays.  Plaintiff Saleh had previously been informed that he would have all the time he needed to gather evidence and/or witnesses in his defense before his second adjudication would occur.

175.   On Tuesday, January 27, 2009, Plaintiff Saleh received a second adjudication for the attack, at which he was issued the same sanctions as at his first adjudication, with the exception of the duration of suspension of his phone privileges, which was reduced.

176.   At this second adjudication, Plaintiff Saleh was told by his hearing officer that the officer expected that Plaintiff Saleh would successfully appeal the adjudication, and that the hearing officer would see him for a third time.  Plaintiff Saleh was also told that if he pled guilty to misconduct, he could receive reduced sanctions.

177.   As of the date of the filing of this complaint, Plaintiff Saleh's appeal of his second adjudication is ongoing.  Plaintiffs Saleh and Nosair remain housed in the D-Unit at the ADX, with no timeframe for their entry into the Step-Down Program or transfer from the ADX.  Plaintiff Elgabrowny has completed six months in the third phase of the Step-Down Program.

178.   Plaintiff Saleh would have completed six months in the third phase of the Step-Down Program on or around November 13, 2008.  The oral testimony of Defendants Nalley and Wiley contradicts the written policies of the Defendant BOP as to whether inmates in the third phase of the Step-Down Program must spend six months or one year in that phase before being eligible for transfer from the ADX.  On information and belief, a former criminal co-defendant of Plaintiffs Saleh and Elgabrowny was so transferred after approximately seven months in the third phase of the Step-Down Program.

179.   The course of the Defendants' conduct with respect to the attack on Plaintiff Saleh indicates that it is the Defendants' clear intention to maintain each of the Plaintiffs in indefinite solitary confinement.  This is further indicated by the fact that, had Plaintiff Saleh not been attacked in September 2008, he could have been transferred from the ADX as early as November 2008, but could then easily be transferred back to the ADX after dismissal of this action with respect to him, due to the Defendant BOP's addition in late 2007 of status-based (rather than conduct-based) criteria for the placement of inmates in the ADX, which expressly include as one criterion the fact that an inmate was "in any way linked to terrorist activities" before incarceration.

## CAUSES OF ACTION

### Claim 1

### DEFENDANTS ACTIONS VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHT TO PRACTICE RELIGION

180.   The parties have entered into a stipulated settlement agreement with respect to Claims 1, 2, and 3 herein.  A Joint Stipulation for Dismissal pursuant to this agreement was filed on December 29, 2008.  Doc. 244.  As of the date of filing of this complaint, no order of dismissal of these claims has issued from the court.

**Claim 2**

**DEFENDANTS ACTIONS VIOLATED PLAINTIFFS'
RIGHT TO PRACTICE RELIGION IN ACCORANCE WITH RFRA**

181.    The parties have entered into a stipulated settlement agreement with respect to this Claim,

as described in Paragraph 180, above.

**Claim 3**

**DEFENDANTS RESTRICTIONS ON PLAINTIFFS'
RELIGIOUS PRACTICES ARE IN VIOLATION
OF THE EQUAL PROTECTION CLAUSE**

182.    The parties have entered into a stipulated settlement agreement with respect to this Claim,

as described in Paragraph 180, above.

**Claim 4**

**DEFENDANTS VIOLATED PLAINTIFFS' LIBERTY INTERESTS
NOT TO BE SUBJECTED TO AN ATYPICAL AND SIGNIFICANT
HARDSHIP IN RELATION TO ORDINARY PRISON LIFE.**

183.    Plaintiffs reallege and incorporate Paragraphs 1 – 179.

184.    Under the Fifth Amendment to the United States Constitution, Plaintiffs may not be

deprived of a liberty interest without due process of law.

185.    Plaintiffs' placement in segregation began on September 11, 2001 and has continued

through the filing of this amended consolidated complaint, and will continue into the

future with no date set for its determination. *Jordan v. Federal Bureau of Prisons*, 191

F.3d 639, 649 (10th Cir. 2006), citing *Giano v. Selsky,* 238 F.3d 223, 226 (2nd Cir. 2001)

(considering total aggregate period of administrative detention, given two periods of

confinement at different facilities were based on the same administrative rationale).

186. This confinement in segregation for over six years has created an atypical and significant hardship in comparison to the ordinary prison life of the general populations where Plaintiffs were removed from. *See Estate of DiMarco v. Wyoming Dept. of Corrections, Div. Of Prisons*, 473 F.3d 1334 (10th Cir. 2007) (comparison of segregation to conditions in general population in determining whether atypical and significant hardship imposed; "She had access to the basic essentials of life, although her access to certain amenities was more limited than the general population." *Id*. at 1343.)

187. Further, Plaintiffs have never been told by the Defendants why they were removed from general population and have been kept confined in segregation for over six years.

188. None of the Plaintiffs were told why they were removed from general population; were given a hearing as why they were removed from general population; were told or given a hearing as to why they were moved from one segregation unit to the segregation unit at ADX; nor were they given reasons for such placements so that they could appeal this indefinite segregation.

189. Plaintiffs have been subjected to an atypical and significant hardship based upon their being confined in segregation for over six years. *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (whether 750 days in segregation imposed atypical and significant hardship in relation to the ordinary incidents of prison life); *Gaines v. Stenseng*, 292 F.3d 1222 (10th Cir. 2002) (remanded for court to determine whether 75 days confinement in disciplinary segregation is atypical).

190. Plaintiffs claim a liberty interest as to their placement in segregation due to their ethnicities and/or their criminal convictions after being imprisoned for approximately seven years and having not violated prison rules.

191.    Plaintiffs claim a liberty interest as to their indefinite placements in segregation when other prisoners have not been placed in indefinite segregation based upon their ethnicities and/or criminal convictions.

192.    Defendants' transfer of Plaintiffs to segregation was done in an arbitrary and capricious manner since they have never been told the basis for such transfers so that they could defend against it.

193.    Defendants failed to provide the Plaintiffs with due process as to their being removed from general population, being confined indefinitely in segregation and for denying step-down for failure to mitigate the reasons for placement in segregation when they never were told why.

194.    The placement of two of the Plaintiffs in the Step-Down Unit Program does not moot their claims since Plaintiffs are alleging that there were no justifiable reasons for removing them from general population in the first place and then to continuing to confine them in indefinite segregation.

195.    For all of the reasons stated above, Plaintiffs had a liberty interest not to be removed from general population and placed in segregation when they were not violent inmates, such as the plaintiffs in *Wilkinson,* nor being subjected to disciplinary confinement, such as the plaintiff in *Sandin.*

196.    For all of the reasons stated above, Plaintiffs had a liberty interest not to be kept confined indefinitely in segregation when the conditions imposed an atypical and significant hardship on the ordinary incidents of prison life, such confinement will impact on their parole eligibilities, and they are placed their indefinitively.

## Claim 5

### PLAINTIFFS HAD A LIBERTY INTEREST NOT BE
### DENIED STEP-DOWN FOR FAILURE TO MITIGATE
### THE REASONS FOR THEIR PLACEMENT IN SEGREGATION.

197.  Plaintiffs reallege and incorporate Paragraphs 1 – 179.

198.  Defendants denied step-down to the Plaintiffs for failure to mitigate the reasons for their placement in segregation.

199.  Since Plaintiffs were never told the reasons for their placement in segregation, they could not challenge that denial.

200.  Defendants' delays and failure in placing Plaintiffs in the Step Down Unit program implicates a liberty interest in transitioning out of ADX.

201.  Defendants denied Plaintiffs due process when they continued to confine Plaintiffs in ADX without meaningful rights to participate in the decision-making processes regarding their placements in the Step Down Unit Program.

202.  In denying Plaintiffs placement in the Step Down Unit program, Defendants and their agents acted in an arbitrary and capricious manner.

## Claim 6

### DEFENDANTS SUBJECTED THE PLAINTIFFS TO A
### VIOLATION OF THEIR EIGHTH AMENDMENT RIGHTS

203.  The parties filed a Stipulation for Voluntary Dismissal of Claim 6 of this complaint on April 23, 2008.  Doc. 175.

**Prayer for Relief**

Wherefore, Plaintiffs respectfully request this Court grant the following relief:

A.  Plaintiffs are entitled to a declaration that the challenged policies and practices denying Plaintiffs their rights to practice their religious beliefs violate the First Amendment to the United States Constitution and the Religious Freedom Restoration Act and as a permanent injunction against these restrictions.

B.  Plaintiffs are entitled to a declaration that the challenged policies and practices denying Plaintiffs rights to practice their religious beliefs in a commensurate manner with similarly situated non-Muslim prisoners violate the Fifth Amendment to the United States Constitution and request that a permanent injunction be issued against these violations.

C.  Plaintiffs are entitled to a declaratory judgment that Defendants have deprived them of a liberty interest without due process of law in their placement in indefinite segregation and a permanent injunction to return them to their former status.

D.  Plaintiffs are entitled to a declaratory judgment that Defendants have deprived them of a liberty interest without due process of law in their continued delays and denials of participation in the decision-making process regarding their placements in the Step-Down Program, as well a permanent injunction to give them proper credit for such arbitrary and capricious denial of entry into the Step Down program.

E.  Plaintiffs are entitled to a declaratory judgment that Defendants' policies and practices subjecting Plaintiffs to prolonged and indefinite solitary confinement, along with little exercise, which both conditions impacting on their mental health, violates the Eighth Amendment and a permanent injunction against these practices.

F.   Plaintiffs also request the Court grant them their reasonable attorney's fees, expenses and

costs.

H.   Plaintiffs also request any additional or alternative relief as may be just, proper, and

equitable.

DATED:  February 6, 2009

Respectfully submitted,

STUDENT LAW OFFICE


s/ Darryl Collins
Darryl Collins, Student Attorney


s/ Gabriel Dusenbury
Gabriel Dusenbury, Student Attorney


s/ Elisabeth Owen
Elisabeth Owen, Student Attorney


s/ Raja Raghunath
Raja Raghunath, Esq.

University of Denver Sturm College of Law
2255 E. Evans Ave., Suite 335
Denver, Colorado 80208
Telephone: (303) 871-6140
Fax: (303) 871-6847
E-mail: rraghunath@law.du.edu

Counsel for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of February, 2009, I electronically filed the foregoing SECOND AMENDED CONSOLIDATED COMPLAINT with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

**Marcy Elizabeth Cook**
Marcy.Cook@usdoj.gov


s/ Raja Raghunath
Raja Raghunath, Esq.