IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO


Civil Action No.  05-cv-02467-PAB-KLM
(Consolidated with Civil Action No. 06-cv-01747-PAB-KLM and 07-cv-00021-PAB-KLM)


MOHAMMED SALEH,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant,

**and**

EL-SAYYID A.  NOSAIR,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,

      Defendant,

**and**

IBRAHIM ELGABROWNY,

      Plaintiff,
v.

FEDERAL BUREAU OF PRISONS,

      Defendant.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN  L. MIX**

This matter is before the Court on **Defendant's Motion for Summary Judgment** [Docket No. 295; Filed March 22, 2010] ("Defendant's Motion"). Plaintiffs filed a Response on June 21, 2010 [Docket No. 323], and Defendant filed a Reply on July 12, 2010 [Docket No. 333]. Thereafter, Defendant sought leave to supplement its Motion (the "Supplement"). Leave was given, and the Supplement was docketed on August 27, 2010, [Docket No. 337]. Plaintiff filed a Supplemental Response on September 10, 2010 [Docket No. 338], and Defendants filed a Supplemental Reply on September 17, 2010 [Docket No. 339]. Defendant's Motion and Supplement have now been fully briefed.

This matter is also before the Court on **Plaintiffs' Motion for Partial Summary Judgment** [Docket No. 296; Filed March 22, 2010] ("Plaintiffs' Motion"). Defendant filed a Response on April 12, 2010 [Docket No. 312], and Plaintiffs filed a Reply on June 21, 2010 [Docket No. 324]. Defendant was given leave to file a Surreply, and it did so on July 21, 2010 [Docket No. 332]. Plaintiffs' Motion has now been fully briefed.

Pursuant to 28 U.S.C. § 636(b)(1) and D.C.COLO.LCivR 72.1.C., the dispositive issues raised in the Motions and Supplement have been referred to this Court for recommendation. Having considered the pleadings, the case file, and being fully advised regarding the issues, the Court recommends that Defendant's Motion and Supplement be **GRANTED** and Plaintiffs' Motion be **DENIED**.

## I. Factual and Procedural Background[1]

Plaintiffs Mohammed Saleh, El-Sayyid A. Nosair, and Ibrahim Elgabrowny each filed

---

[1] The background facts are primarily taken from the Second Amended Consolidated Complaint [#251] ("Amended Complaint") and my earlier Recommendation on the Motions to Dismiss [#196]. The Court will discuss the relevant disputed and undisputed facts where necessary in the analysis of Plaintiffs' claims.

a federal lawsuit to address their placement at the United States Penitentiary, Administrative Maximum Prison in Florence, Colorado ("ADX").   Their cases were consolidated on September 24, 2007 [Docket No. 99].  Plaintiffs are currently incarcerated at ADX and serving sentences, in part, for their roles in the 1993 World Trade Center bombings.  *See United States v. Rahman*, 189 F.3d 88, 103-04 (2d Cir. 1999).   On September 11, 2001, the date of the second World Trade Center bombings, Plaintiffs were removed from the general population at the facility where each was then incarcerated and placed in administrative segregation at those facilities.  *Amended Complaint* [#251] at 4-6. Each was later reassigned to ADX and placed in the general population unit, *id.* at 6: Plaintiff Elgabrowny was reassigned in August 2002, Plaintiff Nosair in September 2002, and Plaintiff Saleh in February 2003.[2]  *Id.* at 14.

Since the filing of their original Complaints, each Plaintiff's incarceration status at ADX has changed.  In April 2007, Plaintiff Saleh was transferred to a marginally less-restrictive unit at ADX known as the "J Unit."  *See Defendant's Motion* [#295] at 15.  In October 2007, he was transferred to an even less-restrictive unit at ADX known as the "K Unit."  *See id.* By May 2008, Plaintiff Saleh was placed in the pre-transfer unit, awaiting eventual transfer out of ADX.  *Id.*  Plaintiff Nosair was transferred to the J Unit in October 2009, where was housed at the time of the filing of Defendant's Motion.  *Id.*  Plaintiff Elgabrowny was transferred to the J Unit in July 2007, the K Unit in January 2008, and the

---

[2] After their reassignments to ADX, Plaintiffs were placed in the general population unit, which they allege is the equivalent of administrative segregation at their previous facilities, i.e., solitary confinement in a cell for 23 hours a day.  *Amended Complaint* [#251] at 6, 9-10. However, at ADX, the country's only federal super maximum prison, the term "administrative segregation" is used to refer to an even more restrictive type of confinement than that imposed on inmates in the general population unit.

pre-transfer unit in August 2008.  *Id.*  At the time of the filing of Defendant's Motion, he had

been transferred out of ADX and was incarcerated at USP-Marion, Illinois.  *Id.* at 16.

Plaintiffs' movement to different units occurred as a result of their admittance to the

Step-Down Unit Program.  *See id.* at 15.   At ADX, in order to move from the general

population unit to a less-restrictive housing assignment – i.e., the intermediate unit (J Unit),

the transitional unit (K Unit), and the pre-transfer unit – an inmate must be enrolled in the

Step-Down Unit Program (or "Program").  *Amended Complaint* [#251] at 8-16; *2009 ADX*

*Step-Down Unit Policy* [#295-2] at 34-46.  Enrollment in the Program is significant because

it is one of the vehicles by which an inmate can later be moved from ADX to a less-

restrictive facility.  *Collins' Affidavit* [#295-2] at 5, 14-18.  However, transition between the

levels of the Program is not automatic, in that an inmate must satisfy certain criteria to be

eligible to do so.  *See id.* at 15.  For example, after Plaintiff Saleh's transfer to the pre-

transfer unit in May 2008, he was cited for fighting and eventually disciplined for the

offense.  *Defendant's Motion* [#295] at 15; *see* Case No. 09-cv-02607-PAB-KLM.  As such,

he was removed from the Step-Down Unit Program and placed back in the general

population at ADX, where he was incarcerated at the time of the filing of Defendant's

Motion.  *Id.*

At present, Plaintiff Saleh has been re-admitted to the Step-Down Unit Program and

is currently housed in the J Unit.  *Defendant's Reply* [#333] at 1.  Plaintiff Nosair has

progressed to the K Unit.  *Id.*  Plaintiff Elgabrowny remains incarcerated at USP-Marion

according to the inmate locator at www.bop.gov.   In summary, Plaintiff Saleh was

incarcerated at ADX in the general population unit for more than four years before his first

admittance to the Program and subsequent transfer to a less-restrictive unit.  Upon his

return to the general population unit after his disciplinary conviction, Plaintiff Saleh was incarcerated in that unit for approximately one additional year before being re-admitted to the Program.  Plaintiff Nosair was incarcerated at ADX in the general population unit for seven years before his admittance to the Program and subsequent transfer to a less-restrictive unit.  Finally, Plaintiff Elgabrowny was incarcerated at ADX for nearly five years before his admittance to the Program and subsequent transfer to a less restrictive unit, and spent approximately seven years at ADX in total.

As inmates incarcerated in the general population unit at ADX, Plaintiffs' conditions were restrictive.  *Amended Complaint* [#251] at 9-10; *Collins' Affidavit* [#295-2] at 5-6; *Plaintiff Saleh's Affidavit* [#296-8] at 5-9; *Plaintiff Nosair's Affidavit* [#296-7] at 5-7; *Plaintiff Elgabrowny's Affidavit* [#296-11] at 7-8.  Each was confined alone to an 87.5 square foot cell for at least 23 hours per day.  The location of the cell prevented each from experiencing direct sunlight, but did provide natural lighting.  Each ate his meals alone in his cell, and when allowed recreation, each was required to recreate alone both indoors and outdoors.  Each showered alone in his cell.  When transported from the cell, each was escorted in handcuffs and shackles.  Each was allowed two, 15-minute phone calls and up to five social visits per month.  After Plaintiffs' admission to the Step-Down Unit Program, they progressed to less restrictive units.  During this progression, their conditions marginally improved and greater privileges, commensurate with the unit's security level, were provided.  *See Collins' Affidavit* [#295-2] at 5-9.

Plaintiffs, who are represented by counsel, have two remaining claims:

Claim Four          Plaintiffs have a liberty interest in avoiding the conditions of confinement at ADX without procedural due process, *Order*

5

[#265] at 16; and

Claim Five          Plaintiffs were denied admission to the Step-Down Unit

Program without procedural due process, *id.*[3]

Plaintiffs seek declaratory and injunctive relief regarding Defendants' alleged violations of their Fifth Amendment rights. *Amended Complaint* [#251] at 30-31. They also seek reasonable attorney fees, expenses, and costs. *Id.* at 31. Plaintiffs name as Defendant the Federal Bureau of Prisons ("BOP").

## II. The Motions

Pursuant to Defendant's Motion, Defendant seeks summary judgment on both remaining claims. To this end, Defendant contends that Plaintiffs do not have a liberty interest in avoiding transfer to and continued placement in the general population at ADX or in being admitted in the Step-Down Unit Program. *Defendant's Motion* [#295] at 31-32; *Supplement* [#337] at 3. In any event, Defendant contends that Plaintiffs received the appropriate level of process. *Defendant's Motion* [#295] at 27-29, 33-35. In addition, Defendant contends that Plaintiff Elgabrowny's claims are mooted by his transfer to a different prison facility, *see id.* at 25-26, that Plaintiffs' ADX transfer and placement claim (Claim Four) has been mooted by recent retroactive transfer reviews, *id.* at 26-27, and that Plaintiffs' Step-Down Unit Program claim (Claim Five) has been mooted by the Plaintiffs' participation in the Program and their recent reviews. *Id.* at 29-31.

---

[3] The remaining claims are labeled Claim Four and Claim Five in the Amended Complaint, and referenced as such in the parties' briefing. *See Amended Complaint* [#251] at 25-29. Despite the fact that there are no other pending claims, the Court also refers to the claims at issue here as Claim Four and Claim Five. All other claims have been settled or dismissed.

Pursuant to Plaintiffs' Motion, Plaintiffs seek summary judgment on Claim Five, namely that they were denied admission to the Step-Down Unit Program without procedural due process.   To this end, Plaintiffs contend that because their placement at ADX constitutes an atypical confinement, and because they have not received meaningful reviews, they are entitled to judgment on their Step-Down Unit Program claim.   *Plaintiffs' Motion* [#296] at 18-35.

### III.  Analysis

### A.     Standard of Review

Summary judgment is proper when the record before the court "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   A dispute is "genuine" if the outcome could be decided in favor of either party.  *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994).   A fact is "material" if it could reasonably affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the movants do not bear the ultimate burden at trial, they need only satisfy the initial burden of demonstrating the absence of evidence to support the nonmovant's case.  *In re Ribozyme Pharm. Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002). Once the motion has been properly supported, the burden shifts to the nonmovant to show the existence of a genuine dispute of a material issue.   The nonmoving party must go beyond the allegations in his pleading and provide "specific facts showing there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).   To satisfy his burden of providing specific facts, the nonmoving party must tender affidavits or other competent evidence. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517

(10th Cir. 1994). The factual record and inferences therefrom are generally viewed in the light most favorable to the nonmoving party. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). However, to be entitled to preferential review, the nonmoving party must respond with competent evidence and cannot support his arguments on the basis of conclusory, speculative, or inadmissible statements. *Bones v. Honeywell, Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004); *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

Where the movants bear the ultimate burden of persuasion at trial, they must show the absence of a genuine issue of material fact by demonstrating each "element of its claim or defense by sufficient, competent evidence to set forth a *prima facie* case." *In re Ribozyme Pharm., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002). After the movant has met its initial burden, the burden shifts to the opposing party to either "produce evidentiary materials that demonstrate the existence of a 'genuine issue' for trial or to submit an affidavit requesting additional time for discovery." *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting); *In re Ribozyme*, 209 F. Supp. 2d at 1111; Fed. R. Civ. P. 56(e)-(f).

Finally, although the Court must construe the filings of a *pro se* litigant liberally, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991), Plaintiffs are not proceeding *pro se*. Accordingly, deferential review of their pleadings does not apply.

### B.      Due Process Generally

Plaintiffs equate their conditions of confinement at ADX to those that inmates may expect to encounter when serving time in administrative segregation at another facility. *See generally Amended Complaint* [#251] at 5-12. In general, "administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt v. Helms*, 459 U.S. 460, 468 (1983). In *Sandin v. Conner*, 515 U.S. 472, 484, 487 (1995), however, the Supreme Court held that restrictive conditions may implicate a liberty interest protected by the due process clause if they "impose[] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See also Wilson v. Jones*, 430 F.3d 1113, 1120-21 (10th Cir. 2005).

To state a Fifth Amendment due process claim, a plaintiff must allege facts that satisfy two elements. *See Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149 (10th Cir. 2001). First, he must show that he possesses a protected liberty interest. *See id.*; *Veile v. Martinson*, 258 F.3d 1180, 1184-85 (10th Cir. 2001). The liberty interest factor is a threshold issue. *Templeman v. Gunter*, 16 F.3d 367, 371 (10th Cir. 1994) (noting that without a liberty interest, "no particular process [is] constitutionally required"). Second, if the threshold issue is satisfied, he must show that he was not afforded the appropriate level of process. *See Bartell*, 263 F.3d at 1149. Here, Defendant argues that Plaintiffs' conditions do not implicate a liberty interest. In the alternative, Defendant contends that Plaintiffs received sufficient process.

### C.      Preliminary Matters

#### 1.      Mootness

Defendant argues that Plaintiff Elgabrowny's claims are moot because he has been transferred to a different prison facility.  *Defendant's Motion* [#295] at 25-26.  Defendant also argues that all of Plaintiffs' claims are moot because they have received retroactive transfer reviews and have been admitted to the Step-Down Unit Program.  *Id.* at 26-27, 29-31.  The Court considers these contentions in reverse order.

### a.    Mootness of all claims

First, the allegation that mere admission to the Program moots Plaintiffs' claims has already been rejected and does not serve as a valid basis for summary judgment here. Specifically, the District Judge assigned to this matter held that entry into the Program does not render Plaintiffs' claims moot because admission is not irrevocable.  *Saleh v. BOP*, No. 05-cv-02467-PAB-KLM, 2009 WL 3158120, at *6 (D. Colo. Sept. 29, 2009) (unpublished decision) (quoting *Friends of the Earth, Inc. v. Laidlaw Environ. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).  In addition, the District Judge noted that Defendant's voluntary cessation of its conduct only serves to moot a claim if Defendant can satisfy the "'heavy burden' of showing that 'it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Id.*  Because admission to the Step-Down Unit Program can be revoked on a variety of bases, Plaintiffs could be restored to their previous positions and units without consideration of whether they have been provided due process.  *See, e.g.*, *Plaintiffs' Response* [#323] at 15.  In these circumstances, Defendant cannot meet its heavy burden of demonstrating mootness.  *See Saleh*, 2009 WL 3158120, at *6.

Second, to the extent that Defendant argues that Plaintiffs' claims are moot because they have been provided with retroactive reviews since the filing of their Amended Complaint, the argument is rejected.  Defendant's unilateral decision to provide additional

10

process to Plaintiffs does not render their claims moot, because the sufficiency of that process is a disputed legal issue in this case.  *See Los Angeles County v. Davis*, 440 U.S. 625, 631 (1979) (noting that "[t]he burden of demonstrating mootness 'is a heavy one,'" and holding that case is not moot unless "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation").  Here, Plaintiffs dispute that the intervening review hearings have satisfied the requirements of due process.  In addition, the Court notes that the heart of Plaintiffs' request for relief is for transfer to a less-restrictive facility and some assurance that they will not be reassigned to ADX without just cause and process, assuming such is legally required.[4]  This remedy has not been fully provided to them and, therefore, prospective relief remains available.  Accordingly, I find that the mootness doctrine is not implicated under these facts.

### b.    Mootness of Elgabrowny's Claims

Plaintiffs acknowledge that, with respect to Claim Five, Plaintiff Elgabrowny's claim is moot.  Specifically, because Claim Five centers on participation in the Step-Down Unit Program, and the process received in relation thereto, Plaintiffs concede that Plaintiff Elgabrowny's successful completion of the Program and transfer to a new facility moots this claim.  *Plaintiffs' Response* [#323] at 18.  As noted above, however, Plaintiffs contend that because Plaintiff Elgabrowny has not been returned to his former status and conditions (despite his placement at USP-Marion), Claim Four is not moot as to him.  I agree.  Plaintiff Elgabrowny still maintains a legally cognizable interest in the outcome.  *See Bldg. & Constr.*

---

[4] For example, while Plaintiff Elgabrowny has been transferred to USP-Marion, Plaintiffs contend that he has not been returned to his pre-September 11th status or conditions.  *See Plaintiffs' Response* [#323] at 14.

*Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993) (noting that mootness only implicated "where 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation'" (citation omitted)).  As will be discussed below, Plaintiffs' current conditions of confinement, all of which appear to be less onerous than the conditions in the general population unit at ADX, do not speak to whether Plaintiffs' due process rights have been violated and whether, because of such violations, Plaintiffs are entitled to be remedied by, for example, restoration of their previous status or conditions.[5] Further, I credit Plaintiffs' contention that the decisions made by Defendant after the case was filed counsel against a finding of mootness in relation to Plaintiff Elgabrowny.  *See Plaintiffs' Motion* [#323] at 21.  In essence, Plaintiffs argue that Claim Four is capable of repetition, yet evading review due to Defendant's "strategic manipulation" of events.  *See id.* (citing *Seneca-Cayuga Tribe v. Nat'l Gaming Comm'n*, 327 F.3d 1019, 1029 (10th Cir. 2003)); *Spencer v. Kemna*, 523 U.S. 1, 17 (1998).  I agree that in this circumstance the "public interest in having the legality of the practices settled . . . militates against a mootness conclusion."  *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).

## 2.    Applicable Conditions

The threshold issue regarding Plaintiffs' due process claims is whether they have a liberty interest in avoiding the conditions of confinement at ADX.  Since the filing of this case, Plaintiffs have each been assigned to new units and, with respect to Plaintiff

---

[5] While Plaintiffs' claim relating to their transfers to segregation at their former facilities has been dismissed as time-barred, I note that Plaintiffs have always compared their conditions at ADX to those they previously experienced and have sought restoration of their pre-September 11th status as a remedy for any due process violation caused by their placements at ADX.

Elgabrowny, a new facility.   Because Plaintiffs' conditions of confinement appear to be moving targets, and because I find that if the conditions in the general population unit at ADX do not implicate a liberty interest, the conditions in less-restrictive units/prisons must similarly fail,[6] the appropriate analysis is whether Plaintiffs have a liberty interest in avoiding incarceration in the general population unit at ADX.   *Cf. Plaintiffs' Supplemental Response* [#338] at 4 n.4.   Further, because I have found that mootness is not at issue in relation to Claim Four, Plaintiffs' current conditions of confinement are arguably irrelevant.   I note that the parties have briefed the conditions of confinement respective to the general population unit.   Accordingly, I am able to resolve the threshold issue on the current pleadings by considering whether such conditions implicate a liberty interest.

### D.     Claim Four

Despite the parties' prolix and voluminous briefing, the legal analysis mandated here is simple.   If there is no material dispute that as a matter of law, Plaintiffs have no liberty interest in avoiding the conditions of confinement in the general population unit at ADX, the analysis ends.   In those circumstances, the parties' hotly contested evidence regarding the process provided to Plaintiffs need not be considered.   Although the Court previously found that Plaintiffs stated a plausible liberty interest in avoiding the conditions of confinement in the general population unit at ADX, *Recommendation* [#196] at 17-24, Defendant argues that this claim nevertheless fails on summary judgment.   *Supplement* [#337] at 1-3; *Supplemental Reply* [#339] at 2-5.   After careful review of the parties' evidence and

---

[6] For example, although Plaintiffs maintain that Plaintiff Elgabrowny's conditions continue to remain restrictive, I do not interpret their argument to be that such conditions are more onerous than the conditions in the general population unit at ADX.

applicable case law, I agree.  My Recommendation is explained in detail below.

Liberty interests "are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," *Shaw v. Murphy*, 532 U.S. 223, 228 (2001), this reality is tempered by the recognition that "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974).   In considering whether Plaintiffs' allegations trigger a liberty interest, I must examine the conditions of confinement before I determine whether such conditions impose an atypical and significant hardship on the inmate.  *See Fogle v. Pierson*, 435 F.3d 1252, 1259 (10th Cir. 2006) (citing *Gaines v. Stenseng*, 292 F.3d 1222, 1225-26) (10th Cir. 2002)).

The Supreme Court addressed the issue of restrictive prison conditions in *Wilkinson v. Austin*, 545 U.S. 209 (2005).  Specifically, the Court considered whether prisoners were deprived of a liberty interest by their placement in Ohio's super maximum prison and whether they were provided sufficient process regarding that placement.  *Id.* at 213. The Court considered the totality of the conditions at the super maximum prison in determining whether confinement there imposed an atypical and significant hardship.  *Id.* at 214-15. Many of the conditions at issue in *Wilkinson* are similar to those complained of here, namely (1) prohibition of human contact; (2) confinement to a small cell for as many as twenty-four hours per day, with one hour allotted for exercise on certain days, but not every

14

day; and (3) undefined length of incarceration in the most-restrictive conditions with limited review regarding the continued propriety of placement.  Also present in *Wilkinson*, but not pled here, was the fact that the lights were left on twenty-four hours a day in each cell and that placement at the super maximum prison disqualified a prisoner for parole.  *Id.*  Given the totality of these conditions, the Court found that confinement at the super maximum prison constituted an atypical and significant hardship such that a prisoner's incarceration there was subject to due process protections.  *Id.* at 220-24.

As noted above, Defendant contends that Plaintiffs' conditions at ADX do not implicate a liberty interest.  As a preliminary matter, mere placement in a unit with restrictive conditions does not, on its own, implicate a liberty interest.  *See Talley v. Hesse*, 91 F.3d 1411, 1413 (10th Cir. 1996); *Templeman*, 16 F.3d at 369.  A determination of what constitutes an atypical and significant hardship necessarily includes a consideration of whether the conditions in question are a dramatic departure from what would ordinarily be expected.  This consideration includes whether the conditions complained of (1) further a legitimate penological interest; (2) are extreme; (3) inevitably increase the duration of a prisoner's sentence; and (4) are for an indefinite term.  *Sandin*, 515 U.S. at 484-87; *Estate of DiMarco v. Wyo. Dep't of Corr., Div. of Prisons*, 473 F.3d 1334, 1342 (10th Cir. 2007) (hereinafter, the "*DiMarco* factors").  This "assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts."  *DiMarco*, 473 F.3d at 1342 (citation omitted).

As a preliminary matter, it must be noted that to date no court in the Tenth Circuit has held that the conditions at ADX, regardless of unit, implicate a liberty interest.  In fact, every court that has addressed ADX conditions on summary judgment has unanimously

15

found that such conditions are not atypically restrictive. *Jordan v. BOP*, 191 Fed. Appx. 639, 653 (10th Cir. 2006) (control unit); *Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2010 WL 1291833, at *11-13 (D. Colo. Mar. 30, 2010) (unpublished decision) (general population unit); *Rezaq v. Nalley*, Case No. 07-cv-02483-LTB-KLM (D. Colo. Aug. 17, 2010) (unpublished recommendation, decision pending) (general population unit). Moreover, in ruling on a motion to dismiss, the District Judge assigned to this matter recently adopted a recommendation to dismiss an identical due process claim involving ADX conditions in the general population unit. *See Matthews v. Wiley*, ___ F. Supp. 2d ___, 2010 WL 3703357 (D. Colo. Sept. 13, 2010) (general population unit); *see also Muhammed v. Hood*, 100 Fed. Appx. 782, 783 (10th Cir. 2004) (upholding dismissal of ADX inmate's habeas due process claim because his conditions in the general population unit, while restrictive, did not amount to an atypical or significant hardship). Similarly, courts which have addressed analogous confinement in units with restrictive conditions have likewise found that they did not rise to the level of those at issue in *Wilkinson. See*, *e.g.*, *DiMarco*, 473 F.3d at 1342-44 (holding that fourteen-month segregation for safety reasons did not implicate a liberty interest); *Thompson v. Rios*, No. 07-cv-00025-MSK-KLM, 2010 WL 749859, at *7-9 (D. Colo. Mar. 2, 2010) (unpublished decision) (holding that seventeen-month confinement in administrative detention at USP-Florence did not implicate a liberty interest).   While these cases are certainly instructive, because I employ a fact-specific consideration of the *DiMarco* factors, they do not necessarily preclude Plaintiffs' claims here. *See Thompson  v. Winn*, 07-cv-00025-MSK-KLM, 2008 WL 901570, **6-9 (D. Colo. Mar. 31, 2008) (unpublished decision) (noting that the "determination of whether there is a protected liberty interest is highly fact dependent and requires consideration of a number

of nonexclusive factors, viewed in their totality").

## 1.   Legitimate Penological Interest[7]

The Court first considers whether Defendant has a legitimate interest in placing Plaintiffs at ADX. As a preliminary matter, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Hewitt*, 459 U.S. at 468; *see also Meachum v. Fano*, 427 U.S. 215, 228 (1976) (noting that "[w]hatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections so long as prison officials have discretion to transfer him for whatever reason or for no reason at all").

The mission of ADX, as set forth in the Inmate Security Designation and Custody Classification Manual [Docket No. 295-1 at 33], is to house "inmates who have demonstrated an inability to function in a less restrictive environment without being a threat to others, or to the secure and orderly operation of the institution."[8] Defendant contends

---

[7] After the briefing of Defendant's Motion had concluded, Defendant sought and received permission to supplement that briefing with a challenge to the liberty interest prong of the due process analysis in relation to Claim Four. In the supplemental briefing, none of the parties substantively discussed the legitimate penological interest or duration factor of the *DiMarco* test. However, I note that this discussion is contained in the parties' pleadings in relation to Claim Five. *See Defendant's Motion* [#295] at 31-33; *Plaintiffs' Motion* [#296] at 23-26. I derive my analysis of these factors from that discussion. In addition, because Claim Five – which addresses whether Plaintiffs' due process rights have been violated by allegedly deficient Step-Down Unit Program reviews – is substantially related to whether Plaintiffs' placement at ADX is sufficiently indefinite, the Court also considers that briefing herein.

[8] To be clear, although Plaintiffs contend that this mission limits the inmates who can be housed at ADX to those who have committed misconduct after incarceration, see *Plaintiffs' Motion* [#296] at 24-26, I do not read the mission statement so narrowly. The use of the word "demonstrated" is unfortunate, as it arguably implies some record of less-restrictive incarceration prior to assignment to ADX. However, the record in this case makes clear that the manual is not so construed by BOP. *See generally Esquibel's Affidavit* [#295-1] at 5 (noting that

that "[t]he confinement of each of the Plaintiffs at ADX is obviously related to the legitimate penological interest of safety and national security. Each of the Plaintiffs were convicted of terrorism offenses related to the 1993 World Trade Center bombings. Their transfers to ADX were primarily based on their terrorist offenses." *Defendant's Motion* [#295] at 31-32. Defendant also notes that "[a]lthough Plaintiffs were not personally involved in the terrorist events of September 11, 2001, those events necessarily changed the way that the BOP managed its facilities, specifically terrorist inmates." *Defendant's Response* [#312] at 26; *Vanyur Deposition* [#296-19] at 3-4; *Junk Deposition* [#297-10] at 3-4. Moreover, each Plaintiff was transferred after the September 11, 2001 World Trade Center bombings at the request of the warden where each was incarcerated. *See Collins' Affidavit* [#295-2] at 19, 25, 27, 49-50; [#295-3] at 3-5, 41-42.

In contrast, Plaintiffs contend that Defendant's proposed penological interest must be determined in the context of how a prisoner has behaved while in prison. To this end, Plaintiffs argue that because they have not exhibited chronic misbehavior while incarcerated, their placement at ADX cannot reasonably be justified by safety concerns.

---

some inmates at ADX are designated directly upon sentencing); *Wiley's Affidavit* [#296-3] at 3, 5 (same, although noting that nature of the conviction is never the sole factor considered). Considering that an inmate can be designated to ADX at the outset of his sentence, it cannot be reasonably argued that an inmate's conviction and background could not provide a basis for his placement there. Deference to an agency's interpretation of its own manual is appropriate "given the specialized experience and broader . . . information available to the agency." *Wilson v. Kastner*, No. 09-6060, 2010 WL 2696829, at *5 (10th Cir. July 8, 2010) (unpublished decision) (citing *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944); *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001)); *see also Reno v. Koray*, 515 U.S. 50, 61 (1995) (noting that agency's interpretation of its policies is persuasive and entitled to "some deference"). Further, requiring BOP officials to wait until the inmate acts out before being permitted to transfer him to a more-restrictive facility would unduly constrain the penological judgment of such officials.

*See Plaintiffs' Motion* [#296] at 25-26.[9]   However, Plaintiffs overlook the fact that determinations regarding safety may reasonably be based on factors other than an inmate's disciplinary record.   Moreover, Plaintiffs provide no compelling legal support for their suggested limitation on the type of information that Defendant may consider before it transfers an inmate to a facility with restrictive conditions.[10]   Further, to the extent that Plaintiffs contend that because they have never created a significant safety issue while incarcerated a material dispute exists as to Defendant's legitimate penological interest, I disagree.   Defendant has a legitimate penological interest in protecting the safety of inmates and staff in the present and the future, not just in the past.   While past good conduct is arguably relevant, it is not a guarantor of future good conduct, and does not neutralize Defendant's legitimate ongoing penological interest in promoting the safety of inmates and staff.

---

[9] I note that Plaintiff Saleh had five disciplinary infractions prior to his transfer to ADX and three since his transfer [Docket No. 295-2 at 63-64].  I also note that Plaintiff Elgabrowny had several infractions prior to his transfer, including "Interfering with Staff–High," "Refusing to Obey an Order," and "Possessing an Unauthorized Item," and several more since [Docket No. 295-3 at 60-61].  Plaintiff Nosair has not had a disciplinary infraction since 1995 [Docket No. 295-3 at 25].

[10] I noted in resolution of motions to dismiss involving this issue that, assuming the allegations of the complaints were true, plaintiffs satisfactorily alleged that the BOP had arbitrarily transferred them to ADX given that BOP officials did not assign them there upon sentencing.  *See, e.g.*, Case No. 07-cv-02483-LTB-KLM; Case No. 07-cv-01839-WYD-KLM. However, the standard of review on a motion for summary judgment allows me to consider additional facts, including the ADX manual, warden statements and deposition testimony.  In this regard, I note that the development of the factual record in this case has revealed that while Plaintiffs were initially placed at less-restrictive facilities, the decisions to transfer them were made after the September 11, 2001 World Trade Center bombings, which was an incident similar to the crimes for which Plaintiffs were convicted.  These transfers were based on the recommendation of Plaintiffs' wardens given their convictions and background [Docket Nos. 295-2 at 48-49, 295-3 at 3-7, 41-42].  In particular, I note that BOP officials were concerned that Plaintiff Nosair was involved in a terrorist network whose mission was to bomb several significant U.S. landmarks and that he had previously conspired in prison to carry out such a mission [Docket No. 295-3 at 6-7].

I find that no reasonable decision maker would disagree that Plaintiffs' backgrounds, including their convictions for their involvement in the 1993 World Trade Center bombings, raised legitimate safety issues following the September 11, 2001 bombings and were properly considered by Defendant in determining whether each warranted restrictive placement. *See generally Vanyur Deposition* [#296-19] at 3-4; *Junk Deposition* [#297-10] at 3-4. I also note that of the two-hundred six inmates in the BOP with international terrorism convictions as of 2009, only thirty-five had been assigned to ADX. *Wiley's Affidavit* [#296-3] at 5-6. This fact signifies that placement at ADX is not arbitrarily imposed on all former terrorists; certain backgrounds raise security concerns while certain others apparently do not. I reject Plaintiffs' contention that because other convicted terrorists or individuals with similar backgrounds are not assigned to ADX, the reasonableness of Defendant's decision to place Plaintiffs at ADX is questionable. *See Plaintiffs' Reply* [#324] at 8 n.5. My review here is limited to whether Plaintiffs' placement passes constitutional muster. There may be many unknown reasons why certain inmates have been classified differently from Plaintiffs, and I will not speculate as to those reasons. It is not my role to second-guess Defendant's decisions further. *See Sandin*, 515 U.S. at 482-83 (noting that courts should give deference to the decisions related to safety made by federal prison officials). Therefore, I find that this argument does not raise a dispute about a material issue of fact.

Further, I reject Plaintiffs' unsupported contention that Defendant cannot offer a legitimate justification for their placement at ADX because "the BOP has asserted that it lacks knowledge of why Plaintiffs were placed at ADX." *See Plaintiffs' Motion* [#296] at 24 n.4. First, this statement has no basis in fact. For example, a BOP official testified that the

20

transfers occurred because of the September 11, 2001 attacks.  *See id.* at 9 (citing *Junk Deposition* [#297-10] at 3-4).  Another BOP official testified that Plaintiffs' prior affiliations with terrorists groups and organizations made them a particular security threat following the events of September 11, 2001, such that increased monitoring of their activities was warranted.  *See Defendant's Response* [#312] at 9 (citing *Vanyur Deposition* [#296-19] at 3-4).  This recognition is also consistent with the wardens' recommendations pertaining to each Plaintiff and the timing of those recommendations.  Second, I have already found that the relationship between Plaintiffs' backgrounds and the September 11, 2001 attacks raised a legitimate concern.  As noted above, safety is a reasonable justification for an inmate's placement at ADX and, given Plaintiffs' criminal and personal history and that history's relationship to a catastrophic terrorist event, safety was a reasonable concern which was properly addressed by restricting Plaintiffs' movements.  Defendant's decisions in this regard, which are supported by a legitimate security concern, are entitled to deference.  *See Sandin*, 515 U.S. at 483; *DiMarco*, 473 F.3d at 1342.[11]

In summary, I find that Defendant has satisfied its burden in relation to this factor and that nothing provided by Plaintiffs in response raises a material dispute.  Accordingly, this factor weighs against finding that Plaintiffs' confinement in the general population unit at ADX implicated a liberty interest.

## 2.    Nature of Conditions

---

[11] To the extent that Plaintiffs' argument could be interpreted to be that the basis for placement now provided by Defendant is undermined by its inability in the past to clearly articulate why Plaintiffs were placed at ADX, Plaintiffs' assertion is material if the justifications provided by Defendant do not speak to Plaintiffs' particular background and history.  Here, however, Defendant's justifications (whether relied on at the time of transfer or thereafter) clearly address the goal of safety in relation to these Plaintiffs.

As noted above, there is some similarity between the conditions experienced by Plaintiff and those at issue in *Wilkinson*.  There are also key differences.  For example, ADX inmates have control over the lights in their cell.  *See Collins' Affidavit* [#295-2] at 8 (noting that "inmate controls the setting of the lights from inside his cell" and is only required to turn them "on when staff are interacting with him").  By contrast, inmates in *Wilkinson* did not; the lights remained on twenty-four hours a day, and inmates who attempted to shield themselves from the light were subject to discipline.  *Wilkinson*, 545 U.S. at 214, 224.  ADX inmates have some opportunity for outdoor exercise, although Plaintiffs dispute whether exercise, outdoor or otherwise, is provided on a regular basis.  *See Plaintiffs' Motion* [#296] at 3-4; *Plaintiff Saleh's Affidavit* [#296-8] at 7-8.  By contrast, inmates in *Wilkinson* did not have any opportunity for outdoor exercise and only recreated in a small indoor room.  *Wilkinson*, 545 U.S. at 214, 224.  ADX inmates have regular contact with staff, although Plaintiffs dispute whether the frequency and quality of this contact is sufficient [Docket No. 297-1]. *See Plaintiff Nosair's Affidavit* [#296-7] at 5-6.  By contrast, inmates in *Wilkinson* had almost no human contact.  *Wilkinson*, 545 U.S. at 214, 224.  ADX inmates have a cell door window and can, on occasion, converse with one another.  *See Collins' Affidavit* [#295-2] at 6; *Plaintiff Elgabowny's Affidavit* [#296-11] at 7 (admitting that conversation can occur, but qualifying that it cannot occur "openly").  By contrast, the cell doors in *Wilkinson* were solid and allowed no opportunity for inmate communication.  *Wilkinson*, 545 U.S. at 214.  ADX inmates may receive up to two, 15-minute phone calls and up to five social visits per month.  *Collins' Affidavit* [#295-2] at 6.  By contrast, inmates in *Wilkinson* were rarely provided opportunities for social visits.  *Wilkinson*, 545 U.S. at 214.

Despite the fact that Plaintiffs' conditions are distinguishable from those at issue in *Wilkinson,* Plaintiffs contend that their conditions are atypical because they cause depression, and they cite to opinions of third parties about the impact of such conditions on an inmate's mental health.  However, such information and argument is insufficient to raise a material dispute.  First, the Court does not consider hearsay statements made in other lawsuits or medical opinions of lay witnesses. Fed. R. Civ. P. 56(e)(1); Fed. R. Evid. 701 & advisory committee notes to 2000 Amendments; *see Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010); *Certain Underwriters at Lloyd's London v. Sinkovich*, 232 F.3d 200, 2003 (4th Cir. 2000).  Second, although Plaintiffs contend that they are suffering from significant mental harm, their conclusory assertions, without sufficient medical evidentiary support, do not create a genuine issue of material fact.  For example, while I note that Plaintiff Nosair was diagnosed with depression in 2007 [Docket No. 296-17], Plaintiffs point to no opinion by a medical expert attributing a diagnosis of depression to Plaintiff Nosair's conditions at ADX.  Moreover, I note that Plaintiff Nosair has refused medical treatment for such a condition [Docket No. 296-17].  Third, to the extent that Plaintiffs contend that they suffer from "loneliness, sadness," "idleness and a loss of . . . sense of self," see, e.g., *Plaintiff Nosair's Affidavit* [#296-7] at 7; *Plaintiff Elgabrowny's Affidavit* [#296-11] at 7, I note that these are typical emotions experienced by prisoners serving time in prison, and they do not raise a material dispute about the extremity of Plaintiffs' conditions.  *See generally, e.g.*, *Bono v. Saxbe*, 620 F.2d 609, 614 (7th Cir. 1980); *Boudin v. Thomas*, 543 F. Supp. 686, 693 (S.D.N.Y. 1982).

Finally, to the extent that Plaintiffs contend that their conditions of confinement at ADX are atypical because they make meaningful interactions with family difficult, see, e.g.,

23

*Plaintiff Elgabrowny's Affidavit* [#296-11] at 2, 7, 11, many of the difficulties complained of are a necessary result of confinement in a federal penal institution. Quite simply, these restrictions and difficulties are a part of the penalty Plaintiffs must pay for their crimes and are certainly not atypical of the ordinary limitations Plaintiffs may experience in interacting with their families were they incarcerated elsewhere in the United States. *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (recognizing that "freedom of association is among the rights least compatible with incarceration . . . [such that] curtailment of that freedom must be expected in the prison context" (citation omitted)). More specifically, the inability to have physical contact during visits is not unique to ADX. *See, e.g.*, *id.* at 134 (noting that ban on noncontact visits was rationally related to legitimate penological interest); *Henry v. Dep't of Corr.*, 131 Fed. Appx. 847, 849-50 (3d Cir. 2005) (holding that permanent ban on contact visits was not cruel and unusual punishment).

Simply, the conditions complained of by Plaintiffs, even considering all of their "disputed" or "partially disputed" facts as true, did not deprive them of "access to the basic essentials of life." *See DiMarco*, 473 F.3d at 1343. This fact was crucial to the court in *DiMarco* which noted that, while the conditions of the inmate were "admittedly Spartan," she still had clean clothing, personal hygiene materials, out-of-cell time, access to prison programs, and ate the same meals as the rest of the prison population. *Id.* Plaintiffs likewise were not deprived of these basic necessities. While they may take issue with the amount of time they were provided to go outside their cell each week, the opportunity for out-of-cell recreation was available to them throughout the duration of their incarceration in the general population unit. Further, in relation to access to prison programs while in the general population unit, I note that Plaintiffs were given access to a wide array of adult

24

education courses.  While Plaintiff Saleh did not take advantage of any of these courses,

Plaintiffs Nosair and Elgabrowny each took an expansive list of courses, including Joy of

Science, Part I and Part II, World Religion, History of Ancient Egypt I and II, Famous

Authors, Argumentation, New York, Physics I and II, Natural Law and Human Nature,

Parenting I and II, and Cultures of the World, to name only a few [Docket No. 295-3 at 25,

60].   Plaintiff Nosair also took advantage of counseling programs such as Anger

Management and Biology and Human Behavior [Docket No. 295-3 at 25].   In addition,

Plaintiffs Saleh and Nosair received several work assignments to serve as orderlies

throughout the duration of their confinement in the general population unit [Docket No. 295-

2 at 63; 295-3 at 25].  An orderly at ADX is tasked with the responsibility of cleaning the

area outside the cells in the range where the inmate is assigned.  *See* Case No. 07-cv-

02483-LTB-KLM, *Recommendation* [#153] at 20.

Nevertheless, Plaintiffs contend that because their conditions of confinement differ

from those they experienced prior to their transfers to ADX, the conditions at ADX must

necessarily be characterized as extreme and atypical.  *Supplemental Response* [#338] at

3.  While such a comparison may be instructive, it does not lead to the inevitable conclusion

that because ADX's conditions are harsher, they are atypical.  *See, e.g.*, *DiMarco*, 473 F.3d

at 1343 (comparing inmate's conditions in segregation to those of inmates in general

population in state prison but finding that such differences did not implicate a liberty

interest).   It does not appear that the parties would dispute that the conditions in the

general population unit at ADX are harsher than those experienced by Plaintiffs prior to

their transfers.  Nevertheless, the Tenth Circuit has recognized that despite unit differences

resulting in one inmate's conditions being more-restrictive than another's, "[t]he prison has

25

no constitutional duty to equalize [amenities] in every detail.  Nor does a prisoner have a right to access every type of program available to other inmates, ranging from work to recreation."  *Id.* at 1343.  Therefore, such differences alone do not make the conditions atypical.

To the extent that any comparison is appropriate, it is a comparison of Plaintiffs' conditions of confinement in the general population unit at ADX with those at issue in *Wilkinson*.  In this regard, I find that no reasonable decision maker would find that the ADX conditions are as extreme as those in *Wilkinson*.  This holding is well supported by the conclusions reached in *Jordan* and *Georgacarakos*.  These cases "aptly demonstrate that restrictions such as those at ADX, while harsh, are not so shocking to the conscience that they can be deemed to be 'atypical and significant' of their own accord."  *Georgacarakos*, 2010 WL 1291833, at *13.  Moreover, it cannot reasonably be disputed that the inmate's conditions in *Jordan* were more restrictive than those at issue in the general population unit at ADX.[12]  In that case, comparing the inmate's conditions to those of the general population at ADX, the Tenth Circuit found that they were not atypical.  *Jordan*, 191 Fed. Appx. at 651-52.  Although Plaintiffs suggest that the length of time each has spent in the general population unit raises a dispute about whether the conditions are atypical, I disagree.   Here, Plaintiffs endured the conditions in the general population unit approximately the same amount of time as the inmates in *Jordan* (five years) and

---

[12] For example, the inmate in *Jordan* did not have unlimited access to television and radio.  *Jordan*, 191 Fed. Appx. at 649-52 (holding that, regardless, inmate's conditions were not as onerous as those at issue in *Wilkinson*).  Here, there is no dispute that Plaintiffs can watch television twenty-four hours per day in their cells and can access sixty broadcast channels and other closed-circuit programming including radio stations.  *Collins' Affidavit* [#295-2] at 8.

*Georgacarakos* (seven years and ongoing).[13]  As such, there is nothing about their length

of confinement in the general population unit (Saleh, five years; Nosair, seven years; and

Elgabrowny, five years) that is not also true of the confinement in the prior cases.  Under

any benchmark, all are particularly long periods of time.  Further, while the length of time

is instructive, it does not impact the fact that the conditions at issue here are simply not as

restrictive as those at issue in *Wilkinson*.[14]  In particular, as recognized by the Tenth Circuit

in *Jordan*, an inmate's opportunity for interaction is a key distinction.  *See id.* at 652.  Here,

it cannot be disputed that as in *Jordan*, Plaintiffs have opportunities to interact with staff

[Docket No. 297-1].  *Compare Plaintiff Elgabrowny's Affidavit* [#296-11] at 7; [#148-10] at

4-6, *with Collins' Affidavit* [#295-2] at 5-10.  Furthermore, despite Plaintiffs' attempts to

raise disputes, I note that they are provided far greater opportunities to interact with other

inmates than was the inmate in *Jordan*.  Specifically, Plaintiffs have the opportunity to

---

[13] *See Georgacarakos v. Wiley*, No. 07-cv-01712-MSK-MEH, 2008 WL 4216265, at *1 (D. Colo. Sept. 12, 2008) (unpublished decision) (noting that inmate assigned to ADX general population unit since March 2003).

[14] Plaintiffs cite several cases from this Circuit for the proposition that incarceration in segregation for long periods of time may constitute an atypical confinement.  *See, e.g., Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (reviewing dismissal prior to development of evidence); *Toevs. v. Reid*, No. 06-cv-01620-CBS-KMT, 2009 WL 598258, at *8 (D. Colo. Mar. 6, 2009) (unpublished decision).  *Trujillo* is not instructive because it involved an analysis of whether the inmate's claims could be summarily dismissed as frivolous.  The court did not reach a decision on the merits.  Likewise, *Toevs* is distinguishable because it involved an analysis of whether the due process claim could survive a motion to dismiss.  In addition, in that case it appears that the inmate was placed in punitive segregation.  Here, the evidence reveals that Plaintiffs' incarceration at ADX is (1) not segregation in the technical sense and (2) not a punishment for unacceptable behavior while in prison, but rather a safety measure given Plaintiffs' backgrounds.  In such a case, I find that the length of time of restrictive confinement becomes less important because it must yield to BOP's legitimate penological interest.  *See generally Hewitt*, 459 U.S. at 468 (recognizing that prison officials have discretion to transfer inmates to more-restrictive confinement for nondisciplinary reasons without necessarily implicating constitutional protections); *Lee v. Huggins*, No. 8:08-cv-1594, 2008 WL 2690101, at *3 & n.1 (D.S.C. July 1, 2008) (recognizing that *Hewitt* remains good law on this significant point).

converse with inmates on either side of their cells and during out-of-cell recreation time. *Collins' Affidavit* [#295-2] at 6; *Plaintiff Elgabrowny's Affidavit* [#296-11] at 7; *see also* Case No. 07-cv-02483-LTB-KLM, *Recommendation* [#153] at 19, 23.

Simply, if the conditions in *Jordan* and *Georgacarkos* were not extreme, the conditions here cannot rise to that level.  I have noted as much in a pending recommendation involving an identical claim.  In Case No. 07-cv-02483-LTB-KLM, I found that despite inmate Rezaq's incarceration in the general population unit at ADX for approximately thirteen years, and the additional evidence and analysis he provided regarding those conditions, his conditions were not extreme [Docket No. 153].  I also note that the District Judge assigned here recently adopted a recommendation to dismiss an identical claim on a motion to dismiss.  *See Matthews*, 2010 WL 3703357, at ___.  The *Matthews* case, which is awaiting publication, further reinforces the conclusion that when conditions which do not deviate from those at issue in *Jordan* and *Georgacarakos* have been pled in a complaint, they "do not give rise to a protected liberty interest."  *Id.* Arguably, given the recent jurisprudence in this District on this issue, an ADX inmate's conditions of confinement claim can no longer survive a motion to dismiss unless those conditions deviate substantially from those at issue in the prior cases.

In summary, I find that Defendant has satisfied its burden in relation to this factor and that nothing provided by Plaintiffs in response raises a material dispute.  Accordingly, this factor weighs against finding that Plaintiffs' confinement in the general population unit at ADX implicates a liberty interest.

### 3. Eligibility for Parole

Whether the inmate's sentence is prolonged by his restrictive placement was a key

consideration to the Court in *Wilkinson*.  *See Wilkinson*, 545 U.S. at 223-24 (noting that parole disqualification elevated restrictive conditions beyond those ordinarily experienced by prisoners in solitary confinement to those giving rise to constitutional protection).  Here, there is no dispute that Plaintiffs' incarceration in the general population unit at ADX does not disqualify them from parole consideration.  *Defendant's Motion* [#295] at 32-33; *Plaintiffs' Motion* [#296] at 23-24.  As such, this crucial factor weighs against finding that Plaintiffs' confinement implicates a liberty interest.

Nevertheless, Plaintiffs argue that this factor is not relevant.  Specifically, Plaintiffs contend that to consider this factor "could result in prisoners convicted before the 1987 elimination of federal parole having a liberty interest  . . ., while prisoners convicted after 1987 . . . would lack a liberty interest." *Plaintiffs' Motion* [#296] at 24.  I am not persuaded. How such a factor may be viewed in relation to inmates who may be parole eligible is not before me.  Regardless of whether an inmate is parole eligible, it has not been shown that placement at ADX impacts that eligibility.  Further, the Court in *Wilkinson* was particularly concerned with any placement that may increase the duration of a prisoner's sentence.  As such, the absence of this concern is significant and cannot be discounted.

In summary, I find that Defendant has satisfied its burden in relation to this factor and that nothing provided by Plaintiffs in response raises a material dispute.  Accordingly, this factor weighs against finding that Plaintiffs' confinement in the general population unit at ADX implicates a liberty interest.

### 4.    Indeterminate Status

Finally, considering the fourth factor enunciated in *DiMarco*, namely whether the placement is indeterminate, the fact that the inmate received regular opportunities for

review of her placement was a significant factor to the court in *DiMarco*.  *See DiMarco*, 473 F.3d at 1343-44; *see also Wilkinson*, 545 U.S. at 224 (noting that indefinite placement elevated isolating conditions beyond those ordinarily experienced by inmates in solitary confinement).   Here, Defendant avers that it is undisputed that Plaintiffs' statuses have been reviewed on a periodic basis through three means:  (1) classification review, (2) program review, and (3) custody classification review.  *Collins' Affidavit* [#295-2] at 10-12, 18-31.  For example, Defendant avers that Plaintiff Saleh has had seventeen program reviews since his transfer to ADX.  *Id.* at 20.  Plaintiff Nosair has had eighteen program reviews since his transfer to ADX.  *Id.* at 25-26.  Plaintiff Elgabrowny had sixteen program reviews while he was incarcerated at ADX.  *Id.* at 29.  Moreover, I note that there is no dispute that Plaintiffs received a review and an opportunity to discuss their status with their Unit Team approximately every six months.  *See Plaintiff's Response* [#323] at 6.  Although Plaintiffs contend that these reviews are meaningless, they do not dispute that they occurred and that they had some opportunity to participate.  *See id.*; *Plaintiff Saleh's Affidavit* [#323-8] at 3; *Plaintiff Nosair's Affidavit* [#323-9] at 3-4; *Plaintiff Elgabrowny's Affidavit* [#323-7] at 3.

Further, I note that the existence of the Step-Down Unit Program was a key consideration to the court in *Georgacarakos*.  *See Georgacarakos*, 2010 WL 1291833, at *13.  There, the court noted that because the inmate "can obtain a transfer out of ADX upon completing the 'step down program,' . . . one can hardly call his assignment there 'indefinite.'"  *Id.*  Although I credited Plaintiffs' contention at the Motion to Dismiss stage that they were being unreasonably denied admission to the Program on the basis of circumstances that they could not mitigate, *Recommendation* [#196] at 32-34, those facts

have now changed.  Further, I note that the decisions of BOP officials, including the decisions not to place Plaintiffs in the Program and the decisions to ultimately do so, are entitled to deference.  *See DiMarco*, 473 F.3d at 1342.

Here, I find that the undisputed fact that Plaintiffs were not admitted into the Step-Down Unit Program for several years after their incarceration at ADX does not make their incarceration there indefinite.  *See, e.g.*, *Jordan*, 191 Fed. Appx. at 652 (holding that five-year incarceration in control unit at ADX and USP-Florence was not indefinite because it was tied to murder investigation); *Geogacarakos*, 2010 WL 1291833, at *13 (holding that ongoing incarceration in general population unit at ADX was not indefinite given the existence of the Step-Down Unit Program).  Comparing the present case to *Jordan*, I note that the inmate there did not appear to have access to the Step-Down Unit Program.  Rather, his incarceration in the control unit at ADX was tied to the length of an investigation involving the murder of a fellow inmate.  Despite the fact that the Tenth Circuit was concerned about the length of time the investigation took, because the segregation was tied to an investigation which ultimately had a finite ending and was related to a legitimate safety interest, the Court concluded that the inmate's incarceration was not indefinite. *Jordan*, 191 Fed. Appx. at 652-53.  The existence of the Step-Down Unit Program and the procedures employed to allow an inmate to advance through its levels provides a far more definite benchmark than an ongoing investigation.   Although Defendant arguably could have admitted Plaintiffs to the Program long before it did, this option was never foreclosed to them and, indeed, Plaintiffs Saleh and Nosair are now moving through its ranks and Plaintiff Elgabrowny has already successfully completed it and been transferred to a new facility.

Nevertheless, Plaintiffs argue that the Step-Down Unit Program review process is meaningless and, because their admission was delayed and they were denied certain information, their incarceration in the general population unit at ADX should be viewed as sufficiently indefinite. *Supplemental Response* [#338] at 7-10; *Plaintiffs' Motion* [#296] at 22-23. Despite the fact that I did not find that Plaintiffs' claims were mooted by their admission into the Step-Down Unit Program, I find that Plaintiffs' admissions to (and for Plaintiff Elgabrowny, his successful completion of) the Program, significantly undercut whether their incarceration at ADX can be reasonably deemed to be indeterminate. The purpose of the Program is to provide a vehicle by which an inmate may be transitioned out of ADX. For some inmates, because of legitimate concerns, this may take a long time and may account for many rejections. Furthermore, I note that the process by which an inmate is reviewed for placement has significantly changed since Plaintiffs were initially denied admission to the Program. The 2009 Institution Supplement explains an inmate's eligibility for admission and advancement [Docket No. 295-2 at 33-46]. While such eligibility is not akin to a right to be admitted or transferred, see *Collins' Affidavit* [#295-2] at 16, I do not read *DiMarco* or *Wilkinson* as requiring such a right. Further, I note that the increased transparency of the Program further undermines any reasonable assertion that incarceration at ADX is indefinite.

The changes to the Step-Down Program Unit review and Plaintiffs' admissions to and/or successful completion of the Program also impact the concern stated in *Ajaj v. United States*, 03-cv-01959-MSK-PAC, 2006 WL 3797871, at *10 (D. Colo. Dec. 22, 2006), namely whether the Step-Down Unit Program meaningfully provides inmates an opportunity to transition out of ADX. The clearest indicator that the Program does provide this

opportunity is Plaintiff Elgabrowny's transfer to a new facility.   Further, despite Plaintiff Saleh's removal from the Program for a brief period of time after he committed a disciplinary infraction, he has been re-admitted to the Program and, as of July 2010, had been placed in a less-restrictive unit and was again progressing toward transfer.   *See Defendant's Reply* [#333] at 1.   Moreover, I note that if any inmate is dissatisfied with a Program review decision, he may challenge that decision with the administrative remedy process which provides yet another avenue of review to Plaintiffs.   *See Collins' Affidavit* [#295-2] at 17-18.   Although Plaintiffs contend that they are not aware of any successful challenge through the administrative remedy process, see *Collins' Deposition* [#323-13] at 26-27, this does not raise a meaningful dispute about its existence and Plaintiffs' opportunity to use it.

In summary, I find that Defendant has satisfied its burden in relation to this factor and that nothing provided by Plaintiffs in response raises a material dispute.   Accordingly, this factor weighs against finding that Plaintiffs' confinement in the general population unit at ADX implicated a liberty interest.

## 5.   Summary of *DiMarco* Factors

Regardless of the existence of immaterial factual disputes, analyzing Plaintiffs' actual conditions in the context of the *DiMarco* factors leads to the conclusion that a liberty interest is not implicated here.   I find that the facts critical to the analysis are not in dispute. Even crediting Plaintiffs' hard-fought effort to liken their conditions to those at issue in *Wilkinson*, the balance of the other factors does not weigh in Plaintiffs' favor.[15]   This is

---

[15] To be clear, the evidence does not support Plaintiffs' contention that their conditions are as restrictive as those at issue in *Wilkinson.*   Nevertheless, even if they were, the balance of

particularly true given that Plaintiffs' incarceration at ADX is neither technically indefinite nor does it impact the length of their sentences. The Court is persuaded that the existence of some conditions analogous to those at issue in *Wilkinson* does not render a prisoner's confinement atypical unless other factors like the deprivation of parole consideration and indeterminate length of placement are also present. In the context of litigation involving nondisciplinary restrictive placements, the circumstances of confinement must create a virtual dead end for the prisoner in order for due process guarantees to become operative. Here, Plaintiffs have exit routes, albeit challenging ones.

The Court in *Wilkinson* appeared to make this point when it noted that "any of these conditions standing alone might not be sufficient to create a liberty interest," and that, rather, the combination of factors shifted the balance in favor of the inmate. *See Wilkinson*, 545 U.S. at 224. Moreover, specifically in relation to ADX conditions, the Tenth Circuit noted that an inmate's restrictive conditions, on their own, were not sufficiently atypical to implicate a liberty interest. *Jordan*, 191 Fed. Appx. at 652. Finally, the Seventh Circuit has interpreted *Wilkinson* to mean that "absent indefinite placement and disqualification from parole," the solitary conditions of confinement in *Wilkinson* do not deviate from the "ordinary incidents of prison life that inmates have no liberty interests in avoiding." *Townsend v. Fuchs*, 522 F.3d 765, 772 (7th Cir. 2008) (refusing to reconsider "established position that inmates have no liberty interest in avoiding placement in discretionary segregation").

Given that I find that Plaintiffs have failed to raise a genuine dispute that their incarceration at ADX implicates a liberty interest, there is no need to consider whether they

---

the other *DiMarco* factors would not prompt a reasonable decision maker to find that Plaintiffs' incarceration in the general population unit at ADX implicates a liberty interest.

have been provided with sufficient due process protections. *Templeman*, 16 F.3d at 369. Accordingly, I recommend that Defendant's Motion and Supplement be **granted** and that summary judgment enter against Plaintiffs on Claim Four.

### E.    Claim Five

In their Motion, Plaintiffs characterize Claim Five as a contention that the BOP violated their due process rights "by failing to provide adequate and meaningful review of their continued confinement at the ADX." *Plaintiffs' Motion* [#296] at 2. Plaintiffs suggest that such a claim is addressed by considering whether: (1) "Plaintiffs have a liberty interest because their confinement at ADX is an atypical and significant hardship in relation to the ordinary incidents of prison life," and (2) "The BOP's Step-Down Program [provides] Plaintiffs with process sufficient to protect their liberty interest." *Id.* at 18, 27. Because Plaintiffs appear to concede that Claim Five is premised on establishing that the conditions of confinement at ADX implicate a liberty interest, my holding above necessarily resolves Claim Five.[16] Simply, the conditions in the general population unit at ADX, do not implicate a liberty interest. As such, no particular process, via the Program or otherwise, is due. *See generally Templeman*, 16 F.3d at 369. Accordingly, I recommend that Defendant's Motion and Supplement be **granted** and that summary judgment enter against Plaintiffs on Claim Five. Consequently, I also recommend that Plaintiffs' Motion, which seeks summary

---

[16] In my review of Plaintiffs' claims on Defendant's Motion to Dismiss, I noted that Claim Five was "really just Claim [Four] stated another way, i.e., that Plaintiffs' placement and continued confinement at ADX violates a liberty interest" for which they have not been provided appropriate process, either at the time of transfer or after transfer via the Step-Down Unit Program. *See Recommendation* [#196] at 32. In a substantially similar case, this Court consolidated identical claims into one claim. *See* Case No. 07-cv-02483-LTB-KLM, *Recommendation* [#57].

judgment in relation to Claim Five, be **denied**.

## IV.  Conclusion

For the reasons stated above, the Court RECOMMENDS as follows:

(1) that Defendant's Motion [#295] and Supplement [#337] be **GRANTED** and that summary judgment be entered in favor of Defendant on all claims; and

(2) that Plaintiffs' Motion [#296] be **DENIED**.

IT IS FURTHER **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen (14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives *de novo* review of the Recommendation by the district judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  November 23, 2010

BY THE COURT:
 s/ Kristen L. Mix
U.S. Magistrate Judge
Kristen L. Mix